**STATE of Minnesota, Respondent,**

v.

**Valentino (NMN) HAZLEY, Appellant.**

**No. C1–87–2511.**

Court of Appeals of Minnesota.

Aug. 16, 1988.

Review Denied Sept. 28, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Melissa Sheridan, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by FORSBERG, P.J., and LANSING and SCHULTZ,* JJ., without oral argument.

## OPINION

LANSING, Judge.

The jury found appellant Valentino Hazley guilty of five counts of second degree assault, Minn.Stat. § 609.222, and one count of aggravated robbery, Minn.Stat. § 609.245. The trial court sentenced him to consecutive terms of 60 months imprisonment for aggravated robbery and 60 months for second degree assault. Hazley appeals the conviction and sentence.

## FACTS

The Minnetonka Chi–Chi's Restaurant was robbed at about 2:00 a.m. on September 21, 1986. Three masked men, one of them holding a gun, walked into the kitchen of the closed restaurant and asked employees Timothy Hall and Jeremy Allshouse where the safe was located. After they said they did not know, they were put in an empty office and told to lie down and cover their heads. Hall observed that one of the men was a "mulatto," or light-skinned black, and was carrying a knife.

A black man wearing a dark jacket and green ski mask and holding a gun entered another office where Steve Newmann, Janine Timm, and Debra Borkowski were finishing paperwork. The gunman told them to get on the floor and when Newmann did not move fast enough, hit him on the head. The man then held the gun to Borkowski's head and made her open the safe. As she was ordered back on the floor, she saw another, lighter-skinned black man, wearing a ski mask and carrying a knife, enter

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 1.

the office. They cleaned out the safe and ran from the office.

Newmann ran after them and saw a brown or maroon car leaving the parking lot. He noted the license plate number as FGL–937, and phoned it in to the Minnetonka police. The police department sent out a dispatch on the car, and also sent officer Richard Dvorak to Chi–Chi's. Dvorak spoke with all five employees, but let Hall and Allshouse go home because they were distraught. He gave Timm, Borkowski, and Newmann written statement forms to fill out.

Meanwhile, Golden Valley police officer Joseph Dutton had heard the radio dispatch and drove west on Highway 12 to County Road 18 to watch for the car. He noticed a brown Pontiac driving east, which slowed almost to a stop when he spotlighted it. Before he pursued it, information came over his radio that another squad had stopped the suspect vehicle. Within moments that report was corrected, and Dutton could still see the Pontiac on the ramp from eastbound Highway 12 to northbound County Road 18. He radioed the dispatcher, and New Hope police officer Allen Server picked up the vehicle at Medicine Lake Road. At 36th Avenue, the Pontiac crossed over and headed back south on County Road 18. Server noted that its license number was FGC–997, but could see only one person in the car. When another Golden Valley squad pulled behind him at the exit to eastbound Highway 55, Server turned on his red lights to stop the Pontiac.

A high speed chase ensued down Highway 55 until the Pontiac made a sharp right-hand turn at Humboldt Avenue in Minneapolis and stopped at a housing development. As Server pulled in behind it, the passenger door flew open and a black man who appeared to be wearing a grayish T-shirt with stripes down the sleeves ran out. Server got out of his car and saw the man coming through the hedges toward him. He stopped the man, later identified as Valentino Hazley, and handcuffed and searched him but did not find a weapon.

Minneapolis police officers David Rumpza and Peter Jackson, assisting the chase, saw the Pontiac stop and two men get out. Rumpza described the passenger as a black man wearing blue jeans and a black jacket with white stripes, but Jackson broadcast a description of the passenger as wearing a gray T-shirt and dark pants. A tape of the radio communications did not indicate that Rumpza corrected Jackson's description, although Rumpza said he tried but must have been cut off. Rumpza chased the passenger briefly, but remained near the Pontiac. He later identified Hazley as the man he had seen leave the Pontiac. Meanwhile, Jackson apprehended the driver, Audwin Duke, who told him that his name was Julius Duke, he had been with Vitto Maloney, and Duke had had the knife and Maloney the gun.

Server turned Hazley over to Minneapolis police officers Michael Fossum and Dan Gustafson. Fossum put Hazley in the squad car and, without giving Miranda warnings, asked him who he was and who was with him. Hazley gave his name and said he was with Audwin Duke.

When a detective back at Chi–Chi's learned that two suspects had been apprehended, he drove Borkowski, Timm, and Newmann to the scene in his squad car. The witnesses remained in the squad while the suspects were brought one at a time in front of the headlights. Based on his clothing, Borkowski and Newmann made a positive identification of Hazley as the gunman, but Timm was unable to identify him. Newmann also identified the Pontiac as the car he had seen leave the parking lot.

Borkowski, Timm and Newmann then went to the police station, where they finished their written statements. It appears from changes in the ink color that Borkowski and Newmann made their original descriptions more specific after having viewed the suspects. Newmann inserted "white striped" over his original description of a "blue windbreaker," and Borkowski wrote "or black" above her original description of "blue jeans." It appears that Timm either started over or did her entire statement at the police station.

At around 3:00 a.m., while searching for physical evidence, deputy Jeffrey Schiebel

found a broken revolver body and several gun pieces, a green stocking cap, and a holster in the far south lane of eastbound Highway 55. A knife, a black stocking cap, and a pillowcase containing Chi–Chi's cashboxes were found in the Pontiac. Hair analysis showed that hairs left in the green stocking cap matched Hazley's and those in the black stocking cap matched Duke's.

At trial, Hall, Newmann, Borkowski, and Timm identified the green mask as that the gunman had worn, although Allshouse thought the robber's mask was darker green. All the witnesses identified the gun, and Hall and Borkowski identified the knife. Allshouse stated that the black, white-striped jacket Hazley had been wearing was not the one he had seen, which was blue and not striped. Hall thought he had seen the black jacket before, but was not sure if it was on the night of the robbery. Newmann, Borkowski, and Timm positively identified the jacket.

Hazley did not testify, but presented an alibi defense through the testimony of his former girlfriend, Sherrillyn Mosley. Mosley testified that she and Hazley had been together that day since the late afternoon or early evening. According to Mosley, she and Hazley had smoked a joint, taken a walk on Plymouth Avenue where people congregated, then returned home between 1:30 and 2:00 a.m. Hazley stayed about five minutes, then she watched him walk home toward the Humboldt apartment complex where he was arrested.

Although other testimony indicated that it had been raining hard that evening, Mosley did not recall if it was raining or not. She also stated that she knew she had spent the evening of the robbery with Hazley because he and his mother called the next day. Jail records indicate that Hazley did not call her until over a week after his arrest, but Hazley's mother testified that she did call Mosley the next day. Mosley made no effort to inform the police or county officials that Hazley had been with her, and had earlier stated that she did not remember if Hazley was with her on that date.

The jury found Hazley guilty, and the trial court sentenced him to consecutive sentences of 60 months for the aggravated robbery of Debra Borkowski and 60 months for the second degree assault of Jeremy Allshouse. Hazley appeals his conviction and sentence.

## ISSUES

1. Did the trial court abuse its discretion in excluding from evidence Duke's statement that he had been with "Vitto Maloney"?

2. Did admission of identification testimony deny Hazley due process of law?

3. Was the admission of Hazley's statement that he had been with Duke reversible error?

4. Did the trial court abuse its discretion in sentencing Hazley to consecutive prison terms for aggravated robbery and second degree assault?

## ANALYSIS

### I

Hazley argues that Duke's statement that he had been with Vitto Maloney should have been admitted as a statement against penal interest or an excited utterance, and that the trial court's failure to admit the statement denied him due process and the right to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (denial of due process to exclude hearsay statements of another man who had repeatedly confessed to murder).

Hazley does not claim that a man named Vitto Maloney exists and actually abetted the robbery. A police search of state records failed to disclose any individual by that name, and Hazley did not produce any contrary evidence. In his argument to the trial court, Hazley's counsel asserted that he was "not trying to get in Audwin Duke's statement that Vitto Malone was with him for the truth of the matter asserted. Rather, [he] was trying to introduce it to show what steps the police officers took in terms of their investigation of the case." The court informed counsel that it believed

that the statement was hearsay and invited him to find an exception which would cover it. Counsel then argued that it was a statement against penal interest, but did not raise the excited utterance exception.

■ Minn.R.Evid. 804(b)(3) provides that a statement which tends to subject an unavailable declarant to criminal liability is admissible if a reasonable man in the declarant's position would not have made the statement unless he believed it to be true. If the statement is offered to exculpate the accused, it is not admissible unless corroborating circumstances clearly indicate its trustworthiness.

■ In this case, Duke is unavailable because he has asserted his fifth amendment privilege. Minn.R.Evid. 804(a)(1). However, it was not against Duke's interest to implicate Vitto Maloney in the robbery, and there was no evidence corroborating that aspect of the statement. *Cf. State v. Black*, 291 N.W.2d 208, 213 (Minn. 1980) (statements may be edited to exclude non-inculpatory portions). The excited utterance exception was not offered to the trial court as a ground for admission. *Cf. State v. Pieschke*, 295 N.W.2d 580, 583–84 (Minn.1980).

■ Finally, defense counsel's proposed use of the statement was only marginally relevant to the issues in the case, particularly because the state has not denied the possibility that a third person may have been involved in the robbery. Unlike the confession in *Chambers*, this statement was not so probative that its exclusion denied Hazley due process, and the trial court did not abuse its discretion in excluding it.

## II

■ Although on-the-scene show-ups are suggestive, they are permissible identification tools and do not preclude admission of identification testimony unless there is a "very substantial likelihood of irreparable misidentification." *State v. Gutberlet*, 346 N.W.2d 639, 642 (Minn.1984); *State v. Harris*, 396 N.W.2d 622, 623 (Minn.Ct.App. 1986).

■ Hazley argues that this show-up was impermissibly suggestive because the police told the witnesses that they had two suspects in custody, and then brought them to the scene where they paraded the suspects. There was no evidence that the police mentioned the number of suspects, and the totality of the circumstances does not indicate a substantial likelihood of misidentification. That two of the witnesses may have made their statements more specific after the show-up does not create a likelihood of misidentification: in both cases the gunman was described before the show-up as wearing dark clothes similar to those Hazley wore. All three witnesses were cross-examined extensively on their identifications, and admission of their testimony in these circumstances did not deny Hazley due process. *See State v. Dillard*, 355 N.W.2d 167, 174 (Minn.Ct.App.1984) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2253–2254, 53 L.Ed.2d 140 (1977)).

## III

According to Officer Fossum, after he arrested Hazley he asked him who he was and who he was with, and Hazley answered that he had been with Audwin Duke. Hazley argues that Fossum's testimony on this alleged exchange should have been suppressed because it occurred before Miranda warnings had been given. The state argues, and the trial court held, that Fossum's question fell within the "public safety exception" to *Miranda* established by *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

In *Quarles*, the police were informed by a rape victim that her assailant had just entered a supermarket and was carrying a gun. The police arrested a man in the supermarket who matched the description, and

> were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket.

*Id.* 467 U.S. at 657, 104 S.Ct. at 2632.

Evidence of the gun was subsequently held inadmissible in a prosecution for crimi-

nal possession of a weapon, but the Supreme Court reversed, holding "on these facts" that failure to give Miranda warnings did not preclude admission of evidence derived from questions which were "reasonably prompted by a concern for the public safety." *Id.* 467 U.S. at 655–56, 104 S.Ct. at 2631–2632. This exception has since been applied to questions whether the suspect had a gun where the situation was unstable because a crowd had gathered or the suspect had not been handcuffed. *See United States v. Brady,* 819 F.2d 884, 887–88 (9th Cir.1987); *United States v. Eaton,* 676 F.Supp. 362, 365–66 (D.Me.1988); *see also United States v. Padilla,* 819 F.2d 952, 960–61 (10th Cir.1987) (question whether persons inside bullet-ridden residence were okay).

■ In this case, however, the question was not limited to the public safety consideration by which the state seeks to justify it. Although the police had reason to believe that one of the robbers had a gun, they asked Hazley who he was with, not where the gun was. *Compare Quarles* 467 U.S. at 659, 104 S.Ct. at 2633 (officer "asked only the question necessary to locate the missing gun"). Missing accomplices cannot be equated with missing guns in the absence of evidence that the accomplice presents a danger to the public "requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime." *Id.* 467 U.S. at 659, n. 8, 104 S.Ct. at 2633, n. 8.

■ We conclude that Officer Fossum's question was not reasonably prompted by concern for public safety, and Hazley's response that he was with Duke should not have been admitted. However, admission was harmless error beyond a reasonable doubt. *See State v. Lloyd,* 310 N.W.2d 463, 464 (Minn.1981). The witnesses positively identified Hazley's clothing and the green ski mask found on the highway where the chase had occurred. The ski mask was not involved in the show-up, and Hazley's hair matched that found in the ski mask. Although hair analysis cannot conclusively identify a hair as belonging to a particular person, the technician who performed the analysis testified that in analyz-

ing 2400 hairs per year for 16 years, she had never found a coincidental identical match.

Finally, Hazley's explanation for his presence at the arrest scene lacked credibility: Mosley testified that Hazley spent the entire evening "walking around" with her, but did not remember that it was raining, and failed to inform the police that he had been with her despite receiving calls from him and his mother shortly after his arrest.

In these circumstances, admission of the statement was harmless error, and the other evidence was sufficient to support the conviction. *See State v. Daniels,* 332 N.W. 2d 172, 180 (Minn.1983).

### IV

■ If a defendant is convicted of multiple current offenses against different persons, the sentencing guidelines permit, but do not require, the imposition of consecutive sentences. *Minnesota Sentencing Guidelines* II.F.2. Hazley asserts that the sentence of two consecutive 60–month terms was disproportionate to the offense because no one was hurt or even substantially threatened, and also argues that the trial court did not consider concurrent sentencing because it thought it had to impose consecutive sentences.

■ It does not appear from the sentencing transcript that the trial court misunderstood the guidelines. The court determined that the guidelines permitted multiple sentencing, and stated its belief that the sentence did not unfairly exaggerate the criminality of the conduct because five victims were ordered to lie down at gunpoint and one victim had a gun held to her head while she opened the safe. In addition, one victim was hit on the head when he didn't move fast enough. The consecutive sentence was not an abuse of discretion.

### DECISION

AFFIRMED.