**UNITED STATES of America,
Appellee,**

v.

**Lafi KHALIL, Gazi Ibrahim
Abu Mezer, Defendant–
Appellants.**

**Docket Nos. 98–1723(L), 99–1134.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 7, 2000

Decided: May 31, 2000

Bernadette Miragliotta, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Emily Berger, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

Bruce McIntyre, New York, New York, for Defendant–Appellant Khalil.

Lawrence F. Ruggiero, New York, New York, for Defendant–Appellant Abu Mezer.

Before: KEARSE, WALKER, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Lafi Khalil and Gazi Ibrahim Abu Mezer appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York following a jury trial before Reena Raggi, *Judge.* Abu Mezer was convicted on two counts of conspiring and threatening, respectively, to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a (1994 & Supp. III 1997), and one count of using and carrying a firearm during and in relation to those crimes, in violation of 18 U.S.C. § 924(c) (1994); he was sentenced principally to two concurrent terms of life imprisonment, to be followed by 30 years' imprisonment. Khalil was convicted of possessing a fraudulent alien registration receipt card ("green card"), in violation of 18 U.S.C. § 1546 (1994 & Supp. III 1997); in an upward departure from the range prescribed by the Sentencing Guidelines ("Guidelines"), he was sentenced principally to 36 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Abu Mezer raises various challenges to his conviction; he challenges his sentence on double jeopardy grounds. Khalil challenges his sentence on the ground that the upward departure was unexplicated and unreasonable. For the reasons that follow, we affirm both judgments. ·

## I. BACKGROUND

The events leading to the arrests of Abu Mezer and Khalil, as described by government witnesses at a pretrial suppression hearing and at trial, were as follows. In late July 1997, Abdelrahman Mossabah, who was then living with Abu Mezer and Khalil in an apartment in Brooklyn, New York, informed officers of the New York City Police Department that Abu Mezer and Khalil had bombs in the apartment and planned to detonate them soon. According to Mossabah, Abu Mezer had said he was "very angry because of what happened between Jerusalem and Palestine."

(Suppression Hearing Transcript, June 1, 1998, at 18.) Abu Mezer had shown Mossabah pipe bombs in a black bag in the apartment and told Mossabah that he planned to take the bombs to a crowded subway or bus terminal and detonate them. Mossabah gave the police a key to the apartment, diagrammed its layout, indicating where the bombs were kept, and led a team of officers to the building before dawn on July 31, 1997.

In the raid on the apartment, two police officers approached the bedroom where the bombs had been shown to Mossabah and heard "ruffling" noises. They opened the door and entered the bedroom, yelling "police, don't move, get down," and saw two men lying on the floor or on a mattress. One of those men lunged, grabbed the gun of one of the officers, and grappled with him; the other man crawled toward a black bag that the officers believed might contain a bomb. The officers shot and wounded both men, disabling them. The wounded men, later identified as Khalil and Abu Mezer, were handcuffed and taken to the hospital.

The officers peeked into the black bag and saw wiring. Technicians thereafter examined the bag's contents; they found pipe bombs, observed that a switch on one of the bombs had been flipped, and were concerned that the bomb would explode before they could disarm it. Other officers went to the hospital and questioned Abu Mezer that morning as to how many bombs there were, how many switches were on each bomb, which wires should be cut to disarm the bombs, and whether there were any timers. Abu Mezer answered all of these questions, stating that he had made five bombs, that they contained gunpowder, and that each would explode when its four switches were flipped. Abu Mezer was also asked whether he had planned to kill himself in the explosion, to which he responded simply, " 'Poof.' "

Abu Mezer was questioned again that afternoon after being given *Miranda*

warnings. He said, *inter alia*, that he had made the bombs, "want[ing] to blow up a train and kill as many Jews as possible" because he opposed United States support for Israel. (Trial Transcript ("Tr.") 1696.) Abu Mezer also stated that he was "with Hamas" (Tr. 1740), a terrorist organization, and had planned to bomb the "B" subway train at 8 a.m. on July 31 because there were "a lot of Jews who ride that train" (Tr. 1696). Questioned as to where he had bought the bomb components, Abu Mezer said he had purchased gunpowder at a gun shop in North Carolina. He had used it to make the bombs found in the raid and had been planning to make one additional bomb in the future. Abu Mezer said that when he realized the police were in his apartment that morning, he had wanted to blow himself up.

Both Abu Mezer and Khalil were indicted on one count of threatening "to use a weapon of mass destruction, to wit, a pipe bomb," in violation of 18 U.S.C. § 2332a, and one count of conspiring to do so, in violation of that section. In addition, Abu Mezer was charged with one count of "us[ing] and carry[ing] a firearm, to wit, a pipe bomb" during and in relation to the weapon-of-mass-destruction crimes, in violation of 18 U.S.C. § 924(c); and Khalil was charged with one count of possessing a fraudulent green card, in violation of 18 U.S.C. § 1546.

Prior to trial, Abu Mezer moved to suppress the statements he had made at the hospital; as described in Part II.B. below, his motion was largely denied. At trial, the government introduced Abu Mezer's unsuppressed statements. It also presented testimony from an expert witness describing the witness's creation and experimental detonation of a mock-up bomb simulating those found in Abu Mezer's apartment; and it introduced a letter that Abu Mezer had sent to the United States Department of State two days before the raid, enclosing a matchstick, and stating, *inter alia*, "we are warning all U.S. citizen embassy building and everything be-

long [*sic*] to the Jewish and Americans in or out said united [*sic*] stat [*sic*] or anywhere around the world we are ready by our soul blood boombes [*sic*].…" In addition, in light of Abu Mezer's argument in his opening statement that he had never intended to detonate the bombs but had merely hoped to obtain money from a United States government program offering rewards for information on terrorism, the government introduced into evidence three photographs that Khalil had taken of Abu Mezer in North Carolina a few weeks prior to the arrests. One photograph showed Abu Mezer holding a shotgun horizontally above his head; the second showed him wearing a scarf that belonged to Khalil and was of a type typically worn by young Palestinian males to signify their roles as extreme warriors; in the third, Abu Mezer was kneeling on the floor in the posture of a martyr in prayer.

Abu Mezer testified at trial in his own defense. He stated that he had come to the United States because he wanted to punish the United States for supporting Israel. He said he had written a letter to the FBI threatening multiple bombings because he wanted to "send them a message" about United States support of Israel. (Tr. 2210–11.) In July 1997, he and Khalil had gone to North Carolina looking for work. While there, Abu Mezer bought materials with which to make bombs, including gunpowder, pipes, caps, wires, switches, and batteries, and brought them back to New York with him. Abu Mezer said that he had made five bombs. In constructing the bombs, he added dozens of nails so that the explosion would inflict as much damage as possible. He planned to use the bombs "against the Jewish [people] of the United States"; with one of his bombs, he planned to "[b]low[ ][him]self up" and take "as many Jews as possible" with him. (Tr. 2212.) Abu Mezer denied, however, any plan to bomb the subway.

Abu Mezer testified that he was alone when he purchased the bomb-making ma-

terials in North Carolina. He said he had never told Khalil of his purchases or of their intended use; and he had never shown Khalil any parts of the bombs or discussed with him using a bomb in any way.

Abu Mezer was convicted on all three of the counts against him. As discussed in Part II.A. below, he was sentenced principally to two concurrent terms of life imprisonment on the § 2332a counts, to be followed by a 30–year term of imprisonment on the § 924(c) count.

Khalil was acquitted on the § 2332a counts but was found guilty on the § 1546 counterfeit green card charge. As discussed in Part II.C. below, the Guidelines imprisonment range for Khalil's offense, given his criminal history, was 0–6 months. In an upward departure based on Khalil's other extensive fraudulent conduct, the district court sentenced Khalil principally to 36 months' imprisonment. These appeals followed.

## II. DISCUSSION

On appeal, Abu Mezer contends principally that the district court erred in denying his motion to suppress certain statements he made while in the hospital and allowing those statements to be introduced at trial; that the court erred in admitting the photographs of him in evidence and in allowing testimony about the mock-up bomb; and that the imposition of the 30–year consecutive sentence on him violated his right to be free from double jeopardy. Khalil challenges his sentence on the ground that the court failed adequately to explain either the ground for departing from the Guidelines range or the reason for the extent of the departure, and that, in any event, the extent of the departure was unreasonable. Finding no basis for reversal in either defendant's contentions, we affirm the judgments. We write principally to address their sentencing contentions.

### A. Abu Mezer's Double Jeopardy Challenge to His Sentence

On counts one and two of the indictment, Abu Mezer was convicted of conspiring and threatening, respectively, to use a weapon of mass destruction, a pipe bomb, in violation of 18 U.S.C. § 2332a, for which he was sentenced to serve concurrent terms of life imprisonment. On count three, he was convicted of using and carrying a firearm, a pipe bomb, in relation to those crimes of violence, in violation of 18 U.S.C. § 924(c), for which he was sentenced to serve 30 years' imprisonment consecutively to his concurrent life terms. Abu Mezer contends that the firearm offense is a lesser included offense of the weapon-of-mass-destruction offenses, and that the imposition of the consecutive 30–year sentence subjected him to double jeopardy. We disagree.

■ The Double Jeopardy Clause protects against, *inter alia*, multiple punishments for the same offense. In this context, " 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' " *Garrett v. United States*, 471 U.S. 773, 793, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (quoting *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)); *see also Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). "Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature—in this case Congress—intended that each violation be a separate offense." *Garrett*, 471 U.S. at 778, 105 S.Ct. 2407. In a single prosecution charging a defendant with violations of two statutes, if the statutes make clear that Congress intended to impose cumulative punishments, the court is authorized to impose those punishments and the Double Jeopardy Clause is not violated. *See, e.g., id.* at 779, 105 S.Ct. 2407; *Missouri v. Hunter*, 459 U.S. at 368–69, 103 S.Ct. 673; *Albernaz*, 450 U.S. at 344, 101 S.Ct. 1137

("Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution.").

■ If the statutes themselves do not make the legislature's intent explicit, the test fashioned in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), may be used to determine whether cumulative punishments were intended. Under the *Blockburger* test, which focuses on the elements reflected in the respective statutory sections, if each section requires proof of at least one fact that the other does not, there are two offenses, and it is presumed that the legislature intended to authorize prosecution and punishment under both. In that circumstance, the imposition of multiple punishments does not violate the Double Jeopardy Clause. *See id.* at 304, 52 S.Ct. 180.

In *Hunter*, the Supreme Court considered whether the Double Jeopardy Clause permitted a defendant to be punished cumulatively after being convicted at a single trial on both a charge of "armed criminal action" and a charge of first degree robbery—the underlying criminal action. 459 U.S. at 360, 103 S.Ct. 673. The pertinent state statute on robbery provided that " '[e]very person convicted of robbery in the first degree *by means of a dangerous and deadly weapon* and every person convicted of robbery in the first degree by any other means shall be punished by imprisonment by the division of corrections for not less than five years....' " *Id.* at 362, 103 S.Ct. 673 (quoting Mo.Rev.Stat. § 560.135 (Supp.1975) (emphasis ours)). The statute proscribing armed criminal action provided as follows:

"[A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous or deadly weapon *is also guilty of the crime of armed criminal action* and, upon conviction, shall be punished by imprisonment by the division of corrections for a term of not less than three years. *The punishment im-posed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of a dangerous or deadly weapon. No person convicted under this subsection shall be eligible for parole, probation, conditional release or suspended imposition or execution of sentence for a period of three calendar years."*

*Hunter*, 459 U.S. at 362, 103 S.Ct. 673 (quoting Mo.Rev.Stat. § 559.225 (Supp. 1976) (emphases ours)). Although Missouri's highest court had interpreted these two sections as punishing the same crime, an interpretation the United States Supreme Court perforce accepted, *see Hunter*, 459 U.S. at 368, 103 S.Ct. 673, the Supreme Court rejected the state court's conclusion that the *Blockburger* test was determinative and that cumulative punishment was proscribed by the Double Jeopardy Clause. The Supreme Court stated that

simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes.

*Hunter*, 459 U.S. at 368, 103 S.Ct. 673. The *Hunter* Court noted that the *Blockburger* test is a rule of statutory construction, to be used "only to limit a federal court's power to impose convictions and punishments when the will of Congress is not clear," 459 U.S. at 368, 103 S.Ct. 673, "not a constitutional rule requiring courts to negate clearly expressed legislative intent," *id.; see also Garrett*, 471 U.S. at 779, 105 S.Ct. 2407 ("the *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history"). Stating that the Missouri Legislature had "made its intent crystal clear," *Hunter*, 459 U.S. at 368, 103 S.Ct. 673, the Supreme Court concluded that

[w]here, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Hunter,* 459 U.S. at 368–69, 103 S.Ct. 673.

We see no principled difference, insofar as double jeopardy analysis is concerned, between the provisions at issue in *Hunter* and those in 18 U.S.C. §§ 924(c) and 2332a. To the extent applicable here, § 2332a provides that

[a] person who, without lawful authority, ... threatens ... or conspires to use[ ] a weapon of mass destruction

. . . .

(2) against any person within the United States, and ... in the case of a threat ... or conspiracy, would have affected interstate or foreign commerce[,]

. . . .

shall be imprisoned for any term of years or for life . . . .

18 U.S.C. § 2332a(a) (Supp. III 1997). For purposes of this provision, the term "weapon of mass destruction" is defined to include *"any destructive device* as defined in section 921 of this title." 18 U.S.C. § 2332a(c)(2)(A) (Supp. III 1997) (emphasis added).

A "destructive device" is defined in § 921 to include "any explosive ... bomb," 18 U.S.C. § 921(a)(4)(A)(i), and "any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) ... and from which a destructive device may be readily assembled," *id.* § 921(a)(4)(C). Section 921 also defines the term "firearm" to include "any destructive device." *Id.* § 921(a)(3). Under §§ 921(a)(4)(A)(i) and 921(a)(3), therefore, an explosive bomb fits within the statutory definitions of both a weapon of mass destruction and a firearm.

Section 924(c) provides severe mandatory minimum penalties for using or carrying a firearm in connection with a crime of violence.· The section defines "crime of violence" as including any felony that "has as an element the use ... or threatened use of physical force against the person or property of another," 18 U.S.C. § 924(c)(3), and it provides penalties, in part, as follows:

Whoever, during and in relation to any crime of violence ... (including a crime of violence ... which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, *in addition to the punishment provided for such crime of violence* ... be sentenced to imprisonment for five years ... and if the firearm is a ... destructive device ... to imprisonment for thirty years.

18 U.S.C. §§ 924(c)(1) (emphases added). In addition, § 924(c)(1) provides that

[n]otwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment *including that imposed for the crime of violence ... in which the firearm was used or carried.*

*Id.* (emphasis added).

In sum, § 924(c) expressly provides that the 30–year sentence for use or carrying a destructive device during and in relation to a crime of violence is to be imposed "in addition to the punishment provided for such crime of violence," 18 U.S.C. § 924(c)(1), and that that additional punishment is to be imposed even if the crime of violence itself carries enhanced punishment for "the use of a deadly or dangerous weapon or device," *id.* And since the prison term for violating § 924(c) cannot be suspended in favor of probation, *see id.*

§ 924(c)(1), and cannot be allowed to run concurrently with the prison term "imposed for the crime of violence ... during which the firearm was used, carried, or possessed," *id.*, it is clear that the firearm-offense prison term must be consecutive. These provisions leave no doubt that § 924(c) describes a firearm offense that is distinct from the underlying crime of violence in connection with which the firearm was carried or used, and that Congress intended the punishments imposed on a defendant convicted of both offenses to be cumulative. In light of the explicit congressional directives, the imposition of cumulative punishment for conviction of § 924(c) and § 2332a offenses in a single prosecution does not violate the Double Jeopardy Clause.

 Nor do we find merit in Abu Mezer's contention that a § 924(c) offense is a lesser included offense within § 2332a. An offense is not lesser included within another offense unless violation of the latter "necessarily entails" violation of the former. *United States v. Woodward,* 469 U.S. 105, 107, 105 S.Ct. 611, 83 L.Ed.2d 518 (1985) (per curiam). Where a person could commit the latter offense without performing all of the acts that are elements of the former, the former is not a lesser included offense of the latter. *See id.* at 107–08, 105 S.Ct. 611; *see also Garrett,* 471 U.S. 789–90, 105 S.Ct. 2407 (discussing relationship of lesser-included-offense principle to double jeopardy analysis in the context of multi-layered conduct). Sections §§ 2332a and 924(c) do of course overlap by reason of the fact that a bomb constitutes both a weapon of mass destruction and a firearm. But not every violation of § 2332a necessarily entails a violation of § 924(c). In order to establish "use" of a firearm in violation of § 924(c), the government must show, *inter alia,* "an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense," *Bailey v. United States,* 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (emphasis in original); *see also id.* at 148, 116 S.Ct. 501 (active employment may consist of the defendant's referring to a firearm that was in his possession). In order to establish "carrying" of a firearm in violation of § 924(c), the government must show, *inter alia,* that the defendant in some manner physically conveyed the firearm. *See Muscarello v. United States,* 524 U.S. 125, 127, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998). To establish a violation of § 2332a, however, the government need not prove that the weapon of mass destruction—or indeed any other device falling within the definition of firearm— was either used or carried. Here, for example, the § 2332a offenses with which Abu Mezer was charged, to wit, conspiring to use a bomb and threatening to do so, required proof of such facts as his joining with another person in an agreement the objective of which was the use of a weapon of mass destruction, and his communication of an intent to inflict harm or loss on another by means of such a weapon. Neither charge required proof of the active employment or the actual conveyance of the weapon. Because such a § 2332a violation may be established without necessarily proving conduct that violated § 924(c), the latter section is not included in the former.

Finally, we note that, while the commission of a crime of violence (or, alternatively, a drug trafficking offense, *see* 18 U.S.C. § 924(c)), is a necessary predicate for a conviction under § 924(c), *see, e.g., United States v. Persico,* 164 F.3d 796, 802 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 171, 145 L.Ed.2d 145 (1999); *see also United States v. Elder,* 88 F.3d 127, 129 (2d Cir.1996) (per curiam) (conspiracy to commit a crime of violence itself a crime of violence within the meaning of § 924(c)(3)), we cannot consider the underlying violent felony to be a "lesser" offense. Plainly, the statutory penalties do not suggest that the substance of a threat to commit mass mayhem is of less importance than the use or carrying a firearm as an instrumentality of that threat. Section 2332a provides that

violation of the weapons-of-mass-destruction prohibitions is punishable by up to life imprisonment, or, if death resulted, it is punishable by death. *See* 18 U.S.C. § 2332a(a). Congress obviously did not intend the crime of violence to be merged into the firearm offense, and " '[t]here is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and *punishing also the completed transaction,*' " *Garrett,* 471 U.S. at 779, 105 S.Ct. 2407 (quoting *Albrecht v. United States,* 273 U.S. 1, 11, 47 S.Ct. 250, 71 L.Ed. 505 (1927), as relied on by *Blockburger* ) (emphasis in *Garrett* ); *cf. United States v. Polanco,* 145 F.3d 536, 542–43 (2d Cir. 1998) (upholding imposition of consecutive sentences for RICO violation and for the murder-related offenses that were charged as RICO predicate acts, in light of clear congressional intent to impose cumulative punishments for RICO violation and its predicate offenses), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 803, 142 L.Ed.2d 664 (1999).

In sum, we see no merit in Abu Mezer's double jeopardy challenge to his sentence.

### B. *Abu Mezer's Other Contentions*

Abu Mezer also contends that the district court erred (a) in denying his pretrial motion to suppress certain of his postarrest statements and in admitting those statements at trial, (b) in admitting the photographs of him in militant and martyr garb and postures, and (c) in allowing testimony as to the experimental mock-up bomb created and detonated by the government's expert witness. We reject these contentions as well.

#### 1. *Abu Mezer's Morning Statements*

Following the raid on Abu Mezer's apartment, officers questioned Abu Mezer that morning at the hospital about the construction and stability of the bombs; he was not at that time given *Miranda* warnings. Abu Mezer moved to suppress his responding statements on the grounds (1) that the warnings had not been given, and (2) that his physical condition, as he was being prepared for life-saving surgery on his leg, prevented his answers from being knowing and voluntary. After an evidentiary hearing, the district court denied Abu Mezer's suppression motion.

As to the first ground, the court ruled that the "public safety" exception, *see, e.g., New York v. Quarles,* 467 U.S. 649, 655–56, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), made interrogation permissible without *Miranda* warnings. Abu Mezer challenges that ruling only insofar as the court failed to suppress his response to the question whether he had intended to kill himself in detonating the bombs, his response having been simply, "Poof." He contends that that question was unrelated to the matter of public safety. We are inclined to disagree, given that Abu Mezer's vision as to whether or not he would survive his attempt to detonate the bomb had the potential for shedding light on the bomb's stability. In any event, even if we were to take a different view as to the relevance of that question, we would conclude that the admission of the "Poof" response at trial was, at worst, harmless error.

In rejecting Abu Mezer's contention that his medical condition prevented his statements from being knowing and voluntary, the district court considered the evidence presented at the suppression hearing, and relied principally on the testimony of one of the interrogating agents and of Abu Mezer's surgeon. The agent testified that although Abu Mezer was in pain, he was alert, seemed to understand the agent's questions, and gave responsive answers. The surgeon testified that Abu Mezer was alert and had no difficulty in understanding her explanation of the surgical procedure he would undergo. The court found these witnesses credible and found that the totality of the evidence indicated that Abu Mezer was alert and men-

tally competent at the time of the questioning.

■ The court's credibility assessments are entitled to deference, *see, e.g., United States v. Rosa,* 11 F.3d 315, 329 (2d Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994), and we see no basis for overturning them. Viewing the evidence in the light most favorable to the government, *see, e.g., United States v. Mussaleen,* 35 F.3d 692, 697 (2d Cir.1994); *United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir.), *cert. denied,* 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995), we see no clear error in the court's factual findings, nor any error of law, *see, e.g., United States v. Miller,* 148 F.3d 207, 213 (2d Cir.1998), *cert. denied,* 525 U.S. 1072, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999); *United States v. Peterson,* 100 F.3d 7, 11 (2d Cir.1996), and we therefore uphold the district court's denial of the motion to suppress the statements given by Abu Mezer at the hospital on the morning of the raid. We also note that, in light of the other evidence at trial, the admission of those statements, if error, was harmless. *See generally Arizona v. Fulminante,* 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *United States v. Esieke,* 940 F.2d 29, 36 (2d Cir.), *cert. denied,* 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991).

### 2. *Abu Mezer's Afternoon Statements*

■ Applying the same standards of review, we also reject Abu Mezer's challenge to the district court's denial of his motion to suppress the statements he gave at the hospital on the afternoon of the raid. The court found that the afternoon statements, made after Abu Mezer had been given *Miranda* warnings, were also knowing and voluntary. Both the surgeon and the agent who questioned Abu Mezer in the afternoon testified that Abu Mezer appeared to understand his rights when read to him, and the court credited their testimony. Although the unusual circumstances of the afternoon questioning, which proceeded intermittently as Abu Mezer

underwent several post-surgical procedures, might have supported an inference that his responses were not knowing and voluntary, we see no error of law nor any clear error of fact in the district court's ruling. Further, as with the morning statements, we conclude that if admission of the afternoon statements was erroneous, the overwhelming weight of the other evidence at trial made any error harmless.

### 3. *The Photographs and the Mock–Up Bomb Evidence*

■ The trial court's evidentiary rulings, including its determination of relevance, *see, e.g., George v. Celotex Corp.,* 914 F.2d 26, 28 (2d Cir.1990), and its assessment that the probative value of relevant evidence is not "substantially outweighed by the danger of unfair prejudice," Fed.R.Evid. 403, are reviewed only for an abuse of discretion. *See, e.g., United States v. Valdez,* 16 F.3d 1324, 1332 (2d Cir.), *cert. denied,* 513 U.S. 810, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994). We see no abuse of discretion in the trial court's admission of the photographs. The defense sought to portray Abu Mezer as a happy-go-lucky boy intent on obtaining money from a government rewards program by pretending to prevent a terrorist attack. Defense counsel also characterized Abu Mezer's admissions in the hospital as hallucinations. The photographs were taken during the period in which Abu Mezer purchased bomb components and constructed five bombs. As they showed Abu Mezer brandishing a shotgun, wearing garb that is associated with violent militants, and assuming a posture of martyrdom, the photographs were relevant to rebut the defense portrayals of Abu Mezer as having no destructive objective and posing no real threat.

■ Nor do we see any abuse of discretion in the admission of expert testimony that a mock-up bomb replicating those made by Abu Mezer had been detonated

and had fragmented into small pieces, spewing nails and shrapnel in all directions. The defense made no suggestion that the mock-up bomb had not faithfully replicated the attributes of the bombs made by Abu Mezer. Given Abu Mezer's defense that he was involved only in a scam, with no genuine threat, evidence as to the massively destructive effect of the devices that Abu Mezer had created was plainly relevant. Any prejudice from a description of the effects of the device was not prejudice that could be considered "unfair."

## C. *Khalil's Challenge to the Upward Departure*

Because Khalil was convicted only of the § 1546 offense of possessing a counterfeit green card, his offense level, calculated under Guidelines § 2L2.2(a), was 8. Given his criminal history category of I, the prescribed range of imprisonment was 0–6 months. The district court, departing upward, imposed a 36–month term of imprisonment. Khalil contends that he is entitled to be resentenced because the district court failed to state whether the departure was pursuant to Guidelines § 4A1.3 or § 5K2.0 and because, in any event, the extent of the departure is unreasonable. For the reasons that follow, we are unpersuaded.

A departure is authorized by § 4A1.3 "[i]f reliable information indicates that the [applicable] criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." Guidelines § 4A1.3 (Policy Statement). If the court wishes to depart on this basis, it is required to

proceed[ ] sequentially from the criminal history category determined by the defendant's criminal history point score through each higher criminal history category until it settles upon a category that fits the defendant. *See [United States v. Stevens,* 985 F.2d 1175, 1185 (2d Cir.1993) ]; *United States v. Jako-*

*betz,* 955 F.2d 786, 806 (2d Cir.), *cert. denied,* [506 U.S. 834], 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Along the way, the district court must pause at each category to consider whether that category adequately reflects the seriousness of the defendant's record. Only upon finding a category inadequate may the court proceed to the next category. *See United States v. Coe,* 891 F.2d 405, 412 (2d Cir.1989). Once the court finds a category that fits, it must " 'use the corresponding sentencing range for that category' " to guide the departure. *Id.* (quoting *United States v. Cervantes,* 878 F.2d 50, 53 (2d Cir.1989)); *see* U.S.S.G. § 4A1.3 ("In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable.").

*United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995).

Under § 5K2.0, a departure is authorized if the court determines " 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.' " Guidelines § 5K2.0 (Policy Statement) (quoting 18 U.S.C. § 3553(b)). The court may depart based on misconduct by the defendant that did not lead to conviction if the defendant committed acts "relate[d] in some way to the offense of conviction, even though not technically covered by the definition of relevant conduct." *United States v. Tropiano,* 50 F.3d at 164 (internal quotation marks omitted). In departing pursuant to § 5K2.0, the court must give explanations for the imposition and extent of the departure that are sufficient to permit meaningful appellate review, but it need not provide step-by-step explanations. *See, e.g., United States v. Tropiano,* 50 F.3d at 163–64; *United States v. Campbell,* 967 F.2d 20, 26 (2d Cir.1992).

The district court cannot avoid the step-by-step framework required for a departure pursuant to § 4A1.3 " 'by classifying a departure based on criminal history as [an offense level departure] involving aggravating circumstances under 5K2.0.' " *United States v. Tropiano*, 50 F.3d at 163 (quoting *United States v. Deutsch*, 987 F.2d 878, 887 (2d Cir.1993)). Nonetheless, while an upward departure based solely on ordinary concerns over recidivism falls squarely under § 4A1.3, *see, e.g., United States v. Tropiano*, 50 F.3d at 163, if the court makes findings distinguishing the defendant from the typical recidivist, it may depart pursuant to § 5K2.0, *see, e.g., United States v. Stevens*, 192 F.3d 263, 267 (2d Cir.1999); *United States v. Mora*, 22 F.3d 409, 414 (2d Cir.1994). If "the district court fail[s] to state the section number upon which it relied to make its upward departure[,] . . . such an omission may be inconsequential if the basis for the departure is obvious in context. . . ." *United States v. Deutsch*, 987 F.2d at 887.

In reviewing a departure, we apply a three-part test. First, we determine whether the reasons articulated by the district court for the departure are "of a kind or a degree that may be appropriately relied upon to justify the departure." *United States v. Tropiano*, 50 F.3d at 162; *see also United States v. Williams*, 37 F.3d 82, 85 (2d Cir.1994); *United States v. Fadayini*, 28 F.3d 1236, 1241 (D.C.Cir.1994). Second, we examine whether the findings of fact supporting the district court's reasoning are clearly erroneous. *See, e.g., United States v. Tropiano*, 50 F.3d at 162; *United States v. Williams*, 37 F.3d at 85. Finally, we review the departure for reasonableness, *see, e.g., United States v. Deutsch*, 987 F.2d at 886; *United States v. Campbell*, 967 F.2d at 26, giving considerable deference to the district court, *see, e.g., United States v. Tropiano*, 50 F.3d at 162; *United States v. Williams*, 37 F.3d at 85. In assessing reasonableness, the court should "look[ ] to the amount and extent of the departure in light of the grounds for departing[,] . . . [and] examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence." *Williams v. United States*, 503 U.S. 193, 203–04, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). "The key question is whether the reasons given by the district court . . . are sufficient to justify the magnitude of the departure." *United States v. Campbell*, 967 F.2d at 26 (internal quotation marks omitted).

In the present case, the government had moved pursuant to Guidelines §§ 5K2.0 and 4A1.3 for an upward departure from the Guidelines range for Khalil on the ground that a six-month prison term was insufficient to reflect the seriousness of his offense in light of his related unlawful conduct. The government argued that in addition to Khalil's possession of the counterfeit green card, the proof developed at trial and during the investigation revealed, *inter alia*, that Khalil had entered the United States illegally, that he possessed a bogus social security card, and that at the time of his arrest he was in the process of obtaining a genuine green card by means of fraudulent representations and forged documents.

In addition, the government pointed to (a) trial testimony from North Carolina store employees indicating that Khalil had participated with Abu Mezer in purchasing bomb components, and (b) a photograph of Khalil surrounded by bomb components shortly before the bomb was completed, indicating Khalil's knowledge of the bombing plot. Thus, the government argued that, contrary to Abu Mezer's exculpatory trial testimony, Khalil had been fully aware of Abu Mezer's plan and had participated in it. The government argued that a departure would thus also be appropriate pursuant to Guidelines § 3A1.4 (calling for sharp increases in offense level and criminal history category with respect to felonies involving, or intended to promote, a federal crime of terrorism).

In all, the government requested that Khalil be sentenced to the 120–month maximum prison term authorized by § 1546, *see* 18 U.S.C. § 1546(a) (10–year maximum for a first or second offense not committed to facilitate drug trafficking or international terrorism).

The district court declined to increase Khalil's sentence for participation in the bombing plot and declined to sentence him to the maximum term authorized by § 1546. Although convinced that Khalil was well aware that Abu Mezer was assembling bombs, the court concluded that there was insufficient evidence either that Khalil had possessed that knowledge before assisting in the relevant purchases or that he participated in any other away. The court concluded, however, that Khalil's sentence should be increased well above the Guidelines range because his possession of the counterfeit alien registration card was but part of a much larger pattern of serious frauds in connection with United States immigration laws. The court stated as follows:

> Most significantly the government points out and the defense does not dispute, the entire scheme for entering this country was fraudulent. The defendant obtained a visa to enter the United States by falsely representing that he was going to be in transit from the United States to Ecuador. In fact, it was always his intention to enter this country. He did not follow the steps and procedures required by United States law in order to obtain such a visa and indeed apparently deliberately sought to mislead immigration authorities. This has to be viewed very seriously by the Court.
>
> Then when here in the United States, the totality of his conduct shows that he was prepared to go to whatever lengths were necessary to continue to avoid United States law regarding the stays by immigrants. He had the counterfeit alien registration card. · He was working without the appropriate papers and au-

thorization for an alien to work. Then he was engaged at the time of his arrest in a further plan to submit fraudulent documents to United States authorities in order to prolong his unlawful stay in this country.

(Khalil Sentencing Transcript, December 3, 1998, at 26–27.) The court pointed out that there was unchallenged evidence that Khalil had procured at least one document with a forged signature in support of his fraudulent scheme, and it concluded that

> [a]ll of this gives the Court real concern about the defendant's lack of respect for United States law and his willingness to engage in whatever repeated crimes were necessary to serve his own selfish purposes. That would be a ground for upward departure.

(*Id.* at 27.)

After discussing its rejection of Khalil's alleged participation in the bombing plot as a basis for departure, the court added:

> I do have a concern about recidivism in this case. The reason goes purely to the facts that I rely on in upwardly departing.
>
> Mr. Khalil, you came to this country illegally, and the pattern of your life for the brief period you were here was repeated acts of lawlessness in an effort to further your own ends. Whatever your definition is of improving yourself, it obviously contemplated ignoring America[n] law if that was in your interest and that cannot be tolerated.
>
> .... It's totally unacceptable for people to get here by fraud and then to spend all of their time in this country ... breaking the law at every opportunity in order to further their own ends.
>
> In sum, even without the context of your crime, which ultimately led to the seizure of a bomb, I would have to view all of this quite seriously.
>
> ....

. . . . I sentence you to the custody of the Attorney General for a period of 36 month[s], three years. .

(*Id.* at 38–39.) ·

█ Although the court did not specify the section on which its departure was grounded, we think its findings make it sufficiently clear that the departure was premised on § 5K2.0. While the court mentioned that it had a concern about recidivism, it stated that that concern was prompted by the factors on which it relied in departing, not that concern for recidivism was one of those factors. Khalil apparently had no known criminal record that suggested that his pattern of unlawful conduct followed punishment or an adjudication of unlawfulness. Rather, the court was plainly concerned with the breadth of Khalil's unlawful and unpunished conduct, and his disdain for United States immigration laws, given the evidence that Khalil had "br[oken] the law at every opportunity in order to further [his] own ends." The court plainly viewed the heartland of § 1546 counterfeit-green-card cases dealt with by the Sentencing Commission in Guidelines § 2L2.2 as not encompassing a defendant who engaged in fraudulent conduct at every turn, and whose possession of a counterfeit green card was, or was planned to be, bolstered by other facially authentic but invalid documentation acquired by means of numerous additional fabrications, frauds, and forgeries. Given the context of the court's statements and the evidence supporting its findings, we think the basis for the departure was obviously § 5K2.0.

We agree with the court that these factors were not considered by the Sentencing Commission and were not adequately accounted for by § 2L2.2. We also conclude that the findings on which the district court relied to reach its conclusion were not clearly erroneous. The record included evidence of Khalil's misrepresentations as to his travel itinerary, his work skills, and his place of employment, as well as evidence of his acts of document altera-

tion and forgery. Khalil concedes that the conduct described by the court actually occurred. We are thus unpersuaded by Khalil's contention that the district court did not adequately explain the ground of its departure.

█ Finally, we are unpersuaded by Khalil's contention that the reasons given by the district court are insufficient to justify the extent of the departure. While refusing to impose a sentence anywhere near the 120–month term requested by the government, the court repeatedly referred to the seriousness of Khalil's conduct. Its statements plainly revealed its view that the appropriate punishment for Khalil should be significantly more severe than the Guidelines-recommended six-month maximum because of Khalil's fraudulent entry into the United States and his engagement in unlawful conduct at every opportunity while in the United States. In light of the evidence as to the breadth and pervasiveness of Khalil's unlawful and fraudulent conduct in addition to his § 1546 offense, and given the deference to which a district court's § 5K2.0 departure is entitled, we conclude that the court's statements here were an adequate explanation for its upward departure to 36 months' imprisonment, and that that departure was not unreasonable.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found in them no basis for reversal. The judgments of conviction are affirmed.