**UNITED STATES Of America**

v.

**Hector MARTINEZ–SALAZAR, a/k/a "Ignacio Mejia," a/k/a "Hector S. Martinez," Defendant.**

**No. 00 CR. 1016(GEL).**

United States District Court, S.D. New York.

Jan. 22, 2004.

128

Benjamin Gruenstein, Assistant United States Attorney, New York City (David N. Kelley, United States Attorney for the Southern District of New York), for the United States of America, of counsel.

Robert M. Baum, Federal Defender Division, The Legal Aid Society, New York City, for defendant Hector Martinez–Salazar.

## SENTENCING OPINION

LYNCH, District Judge.

Defendant stands before the Court for sentencing following his plea of guilty to one count of illegal reentry after deportation. There is no dispute that under the sentencing guidelines, his offense level is 21 and his criminal history category is III, resulting in a guideline sentencing range of 46–57 months. Defendant seeks a downward departure on various grounds. Most of the sentencing issues in the case were dealt with orally on the record at defendant's sentencing. This opinion addresses only one of those issues, and elaborates on the rationale of a departure in an interesting, and relatively common, situation in which a departure from the guideline sentence is sometimes required to effectuate the intention of the guidelines themselves.

### FACTS

Like many others convicted of illegal reentry, this defendant, who had previously been deported as a result of criminal conduct, was again "found" in the United States after being again arrested by state authorities for an additional crime. The specific facts fit a depressingly familiar pattern. Defendant was convicted in 1994 in New Jersey of possession of narcotics with intent to distribute, sentenced to imprisonment, and deported to the Dominican Republic in 1995. In 1999 he was arrested in New York on another narcotics charge, and by about April 2000 the dots were connected and the immigration authorities became aware of his illegal reentry into the country. He was indicted for the immigration offense on September 28, 2000.

Meanwhile, however, in early May 2000, defendant had jumped bail on the state charges. Apprehended again on or about May 26, 2001, defendant eventually pled guilty to the state charges and on July 9, 2002, he was sentenced to 5–10 years' imprisonment on the state charges. He has been continuously in state custody since May 2001. Nevertheless, it was not until March 7, 2003, nearly two years after his return to state custody, that he was writted to this Court to face the outstanding reentry indictment. Having pled guilty on

June 20, 2003, he has now been in federal custody for over ten months.[1] Because he was in custody as a sentenced state prisoner, none of that time will be credited against any federal sentence that will be imposed as a result of the instant case.

## DISCUSSION

### I. Sentencing a Defendant Already Serving a Prison Sentence

A major purpose of the Sentencing Reform Act of 1984 and the sentencing guidelines system it creates is to eliminate arbitrary disparity in the treatment of different offenders convicted of the same crimes, and to assure that similarly situated offenders are treated similarly. This, however, is a goal easier announced than accomplished, given that federal sentences account for only a small portion of all American offenders. The interaction between the laws of the fifty states, which govern the treatment of most offenders, and federal law, can often produce perplexing disparities, particularly where the same criminal is to be sentenced under both state and federal law.

The guidelines recognize this problem, and also recognize that simple rules cannot guarantee fairness in all situations. Thus, when a defendant facing federal sentence is already serving another term of imprisonment (usually but not necessarily a state sentence), the sentencing court must decide how to coordinate the federal punishment with the existing state sentence. In principle, the coordination can be accomplished by making the federal sentence run concurrently, consecutively, or partially concurrently with the existing sentence. Addressing this choice, the guidelines create rules that cover the most extreme or easily analyzed situations. Thus, if the new crime was committed while the offender was already serving his state sentence, the additional sentence is to be imposed consecutively. U.S.S.G. § 5G1.3(a). Few could quarrel with this result. The new crime is completely independent of that for which the earlier sentence was imposed, and was committed in spite of whatever deterrence or rehabilitation one might have hoped the first sentence would accomplish; thus, a totally new and additional punishment is called for. At the other extreme, the guidelines require a concurrent sentence where the conduct now being punished was already completely taken into account by the prior sentence. U.S.S.G. § 5G1.3(b). Again, this is an obviously correct result: if the conduct has already been punished, it would not be fair to impose an additional punishment for the same behavior.

But these rules cover only the narrow situations they specifically address. "In any other case," the guidelines leave the question of concurrent versus consecutive sentencing in this situation to the discretion of the sentencing judge, "to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c). Certain factors are set forth for the court to consider, see U.S.S.G. § 5G1.3, Commentary, Application Note 3, but the Sentencing Commission understandably chose to give broad discretion to the sentencing court to deal with the great variety of circumstances that could arise, and made no effort to categorize cases or dictate the weight to be given to various factors.

In short, the intention of the guidelines is that where a defendant who is already imprisoned for a former offense is to be sentenced for another crime, the Court is

---

1. Part of this delay is attributable to the backlog of criminal cases awaiting pre-sentence reports; the report in this case was completed on September 18, 2003. The delay since then is attributable to psychological evaluations sought by the Government in response to defendant's seeking a departure on grounds of diminished capacity.

in most cases to have discretion to impose a sentence concurrently or consecutively, so as to accomplish the goals of sentencing set forth by Congress in the Act.

## II. *Departures for Lost Opportunities for Concurrent Sentencing*

This intended discretion, however, can be frustrated, intentionally or otherwise, by Government actions. Subject to the statute of limitations, the Government has unilateral discretion over the timing of indictments. Thus, where the federal authorities seek to charge someone who is serving time in a state prison, the Government decides whether he is charged immediately, or not until he has served several years in prison. Similarly, even where a defendant has been indicted, a court has no way of knowing that the defendant is in custody in some other jurisdiction. The Government initiates the process by which a state prisoner is brought to federal court, pursuant to a writ of habeas corpus *ad prosequendum,* to face the federal charges. If the Government, intentionally or otherwise, delays these processes, the intended discretionary authority of the Court to impose a concurrent or consecutive sentence to achieve the proper objectives of sentencing is *pro tanto* preempted. That is, the Government, by waiting to charge or acquire custody over the defendant until his state sentence is nearly expired, can render the question of concurrent sentences moot, and defeat the Court's power, granted by the guidelines, to decide that question.

In *United States v. Los Santos,* 283 F.3d 422 (2d Cir.2002), the Court of Appeals addressed this situation. The sentencing judge had departed downward from the guideline sentence for illegal reentry, in order to give the defendant credit for time spent in processing his case. After holding that credit for the time spent in federal custody was a matter for the Bureau of Prisons, and that there was no justification for crediting defendant with time in state custody before the Government was aware of him, *id.* at 427, the Court addressed the four months during which he was in state custody between the date the immigration authorities learned of his presence, and the date on which he was brought to federal court to face the immigration charge. Given the relative brevity of the delay, the Court rejected the defendant's argument for departure covering this period, noting that even for the relatively simple crime of illegal reentry, the Government needs a reasonable period of time to investigate the case. *Id.* at 428. However, the Court also rejected the Government's argument that "any delay of prosecution that occurs within the applicable statute of limitations should be deemed presumptively legitimate and is within its prosecutorial discretion." *Id.* Of course, a bad faith delay, concocted for the purpose of defeating the sentencing court's discretion and unilaterally increasing the penalty to be served, would warrant a departure. But even that, the Court ruled, is insufficient protection for defendants:

[A] rule requiring a defendant to show bad faith on the government's part would nearly always prove to be an insurmountable burden for the defendant, even in a case where the delay is extreme. Moreover, such a rule would enable the government to be utterly negligent and careless in its prosecution without giving recourse to a defendant, the only one who would suffer from such negligence.... Considering [the relevant] cases and the policy concerns raised by the government in their brief, we hold that in order for a district court to depart under § 5K2.0 based on a prosecutorial delay that resulted in a missed opportunity for concurrent sentencing, the delay must either have been in bad faith or have been longer than a reasonable amount of time for the gov-

ernment to have diligently investigated the crime involved such that the delay takes the case out of the heartland. *Id.* Other circuits have reached similar conclusions. *United States v. Sanchez–Rodriguez,* 161 F.3d 556, 563–64 (9th Cir. 1998) *(en banc );* *United States v. Saldana,* 109 F.3d 100, 104 (1st Cir.1997).

█ Thus, a sentencing court is permitted to depart where the delay in prosecuting a state prisoner for a federal crime is longer than a reasonable period to conduct a diligent investigation, and the sentencing court concludes that a concurrent sentence would otherwise be in order. This Court has had occasion to depart on this ground in two recent cases, suggesting a disturbing pattern of undue delay. In *United States v. Castillo–Pena,* No. 00 Cr. 184 (S.D.N.Y. Dec. 12, 2003), the defendant was indicted for illegal reentry in February 2000, and was known to the Government to be in state prison in Florida by, at the latest, December 2001, but was not writted to federal custody until May or June of 2003. In that case, moreover, the delay effectively foreclosed *any* meaningful possibility of concurrent sentencing, because by the time of his federal sentencing, the defendant's state sentence had only days more to run. In *United States v. Mendez,* No. 03 Cr. 190 (S.D.N.Y. Sept. 3, 2003), the delay was even more egregious. There, the immigration authorities became aware of defendant's presence in the United States, in state prison, no later than January 2001. He was not charged with illegal reentry until April 2003, 27 months later—a delay nearly seven times as long as that in *Los Santos,* for which the Government proffered no reason other than inadvertence.

It should be noted that the circumstances permitting such a departure will be very narrow. The statute of limitations is the principal protection for defendants against prejudice due to dilatory investiga-

tions by police and prosecutors, and the Supreme Court has rejected efforts to use the Constitution's guarantees of speedy trial, *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), or due process, *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), to second-guess the timing of investigations and indictments. The courts respect the discretion necessarily accorded to the executive to prioritize the use of its resources and to assess what steps are necessary to carry out its responsibilities to be sure a charge is justified, and to develop as much evidence as it needs to win a criminal case. In most cases, it will be difficult or impossible to establish a "reasonable" time for investigation, particularly considering that the Government can legitimately decide that cases involving prisoners already in custody may fairly be given a lower priority than cases where the prompt apprehension and prosecution of a criminal is necessary to protect the public. It is thus hardly accidental that all of the cases discussed above are illegal reentry cases, in which the investigation required is minimal.

Unlike the defendants in *Marion* and *Lovasco,* however, the defendants in these sentencing cases do not seek dismissal of indictments and immunity for crimes they have committed. They seek only the opportunity to be sentenced in accordance with the purposes of the sentencing guidelines and the Sentencing Reform Act. Defendants cannot be subjected to longer sentences than are fair, and the public cannot be subjected to the expense of unnecessarily lengthy prison terms for defendants who will in any case be promptly deported, simply because the Government is lackadaisical about prosecuting them. Absent departures, the intention of the Sentencing Reform Act would be defeated, and disparity between similarly situated defendants created, because the length of

a sentence would depend not on the defendant's conduct and prior record, but on the speed with which the prosecutor in their case happened to act.

Finally, it should be noted that fine-tuning sentences in this situation to achieve equal sentencing outcomes is all but impossible. Since state sentences are often parolable, the use of concurrent or consecutive sentences to calibrate precisely the total period of incarceration of a defendant will not be possible. Moreover, the length of proceedings between the institution of federal charges and sentencing will vary from case to case, and the assessment of a "reasonable" time for investigation will be inexact at best. But where the delay in federal prosecution is extreme and unreasonable, some departure will be justified where the sentencing court concludes that a concurrent sentence would have resulted had the prosecution proceeded on a reasonable timetable, and the defendant has lost all or part of the opportunity for concurrent sentencing due to unreasonable delay.

## III. *The Delay in the Instant Case*

▇ The total delay in this case is easily calculated. Defendant had been indicted for illegal reentry in September 2000, following his arrest on state charges. He was back in custody on those charges by the end of May 2001, and the Government does not claim that it was unaware of his presence. Since defendant was already under indictment, no particular investigation was required, although the Government must be allowed some reasonable period to process the paperwork necessary to secure federal custody. Defendant was not writted to federal court until March 7, 2003. Thus, there was a delay of some 21 months in processing his federal case. This delay is five times longer than that found reasonable in *Los Santos,* a case in which the Government needed to investigate and obtain an indictment.

Assessing the reasonableness of the delay in the instant case is complicated by several factors. First, the Government rightly points out that defendant brought some delay upon himself by jumping bail on his state case. Had he not fled, his state case would have been processed more promptly, and in theory he could have been equally promptly brought to federal court to be prosecuted on the immigration charge. That argument, however, is highly speculative. The calculation above gives defendant no credit for the time between his federal indictment and his reapprehension by the state authorities in May 2001, since that delay is clearly attributable to him and not to the Government. At the same time, given the Government's track record in this case and in other cases, the Court cannot blithely assume that the Government would have acted more expeditiously than it actually did, if only defendant had allowed his state case to be speedily prosecuted. We can only assess what the Government did once it knew that defendant was back in state custody, and not hypothetically construct an alternate universe in which defendant did not jump bail, and was prosecuted in 2000 rather than in 2001.

Second, the Government points out that a "reasonable" delay in processing immigration cases meant something different in late 2001 than it might have meant in some other period. The factual premise of this argument is surely correct, for obvious and tragic reasons. The terrorist attacks of September 11, 2001, required a reassignment of immigration agents from routine prosecutions to the more pressing business of investigating potential foreign terrorist agents on our soil. The Government thus seeks to excuse part of the delay in this case by pointing out that from September 2001 to May 2002, no agent was assigned to this case. Clearly, the Government's allocation of priorities cannot be faulted.

It is less clear, however, that this affects the rationale for departure. This defendant should not suffer an unjustified additional eight months of incarceration as a result of the crimes of terrorists for which he has no responsibility. The Second Circuit in *Los Santos* held that a departure would be authorized where the delay was "longer than a reasonable amount of time for the Government to have diligently investigated the crime involved." 283 F.3d at 428. The *Los Santos* Court was not confronted with a situation in which the delay was longer that a reasonable amount of time typically necessary for the Government to investigate a case of this kind, but where circumstances having nothing to do with the defendant or the facts of his case resulted in delay for which the Government is not fairly held accountable.

The issue in these departure cases, however, is not whether the Government behaved badly. Unlike a defendant who seeks dismissal of charges because of laggard investigation, the defendant in this case does not seek a windfall immunity from justified prosecution in order to deter the Government from abusing its discretion over the timing of charges. Rather, defendant here seeks only an opportunity to have his total sentence be what it should be under the guidelines. Only unreasonable delays justify a departure, not because only unreasonable delays are culpable, but because no system of guidelines or departures can create perfect equality of sentencing, or eliminate minor disparities due to the ordinary and reasonable vagaries of the criminal process. Where the delay is extreme, and transcends what is normal and reasonable, a departure is warranted even if the Government is not to blame for the delay.

On the facts of this case, however, the Court need not decide whether a departure would be justified had the delay in prosecuting this defendant been *solely* at-tributable to reasonable terrorism-occasioned allocation of resources, for that is not what occurred. Here, the Government did not promptly move to address these charges even after investigative priorities became more normal. By the Government's own account, an agent was assigned to this case again in May 2002, and it *still* took ten months for the Government to seek a writ of habeas corpus to commence proceedings in this Court. The Government seeks to excuse this delay too, by building a chain of "House–that–Jack–Built" excuses: the Government mistakenly undertook to reinvestigate the case, because the agent assigned to the case had forgotten that defendant was already indicted, because the agent was new, because the old agent was reassigned due to the terrorism emergency, which only affected defendant because he had run away, since the Government might have proceeded more expeditiously in 2000 than it actually did between his rearrest in May 2001 and the terrorist attacks in September, which in turn caused the reassignment of the personnel who had not managed to obtain a writ during those months—and so on. But even if every individual prosecutor and agent can explain his or her conduct—and the Court makes no finding that any individual was in any way blameworthy or negligent—the Government as an institution cannot justify a delay in prosecution on the theory that it collectively can't keep track of whether a defendant is under indictment or not. Nothing but inadvertence accounts for the delay from May 2002 to March 2003. Under these circumstances, a departure is justified. And given that a departure is justified, the extent of departure should be determined by an effort to replicate the total sentence contemplated by the guidelines for a defendant like this one, rather than by an ultimately fruitless effort to assign precise

time periods to the Government's or the defendant's account.

## IV. *Would a Concurrent Sentence Have Been Imposed?*

The purpose of the *Los Santos* departure is to effectuate the intention of the guidelines that a defendant who is already serving a term of imprisonment be sentenced concurrently or consecutively as is necessary to serve the statutory purposes of punishment. Thus, assuming other conditions for the departure are met, a departure still will not be justified unless the Court concludes that the defendant would have received a concurrent sentence had the sentence not been delayed.

Determining whether a sentence should be concurrent or consecutive is not an easy task. Generally speaking, imposing sentence for multiple crimes presents a tension between two goals. On the one hand, a criminal who commits several offenses should not receive a "free ride" for some of them by the heedless use of concurrent sentences. On the other hand, simply to add the usual sentences for each crime by the use of consecutive sentences will often be excessive; punishment, like capital, suffers from a law of diminishing returns.

Where the sentences for several crimes are imposed all at once in federal court, the guidelines themselves provide a complex set of rules to address this problem. The so-called grouping rules of U.S.S.G. Part 3D provide useful guidance in the somewhat different context of coordinating state and federal sentences. The grouping rules attempt to avoid the pitfalls of both overly concurrent and overly consecutive sentencing, by assuring that there is an increment of punishment for all serious crimes committed by a multiple offender, with the important qualifications (1) that the increment is rather less than the simple addition of the punishment for each crime separately, and (2) that some minor crimes will be disregarded or subsumed where a substantial sentence is imposed for a separate offense. *See* U.S.S.G. § 3D1.4.

The grouping rules depend on the offense-level system of the guidelines themselves, and thus cannot simply be transferred to the coordination of a federal sentence with a state sentence for a state crime that does not come within the guideline system. Nevertheless, the principle is a just one, and some rough guidance can be obtained by looking to the nature of the increments imposed under the guidelines. The principle of § 3D1.4 can be simply stated: unless a secondary crime is fairly trivial in proportion to the more significant crime, there should ordinarily be *some* additional punishment to accomplish the goals of retribution and deterrence; however, that increment will ordinarily be significantly less than would be entailed by a simple consecutive sentence. In this case, for example, the defendant's state sentence is 5–10 years, and the recommended federal guideline sentence for his immigration crime is 46–57 months. While a parolable sentence is not easily comparable to federal non-parolable sentences, it is clear that the federal sentence is somewhat less serious than that imposed by the state for defendant's narcotics crime, but is by no means trivial. Under the guideline system, the reentry sentence thus would not be totally subsumed in the narcotics sentence, and therefore should not be made totally concurrent. On the other hand, where two different types of crimes are involved, and one is somewhat less serious than the other, the increment of punishment is in no way comparable to a fully consecutive sentence. Indeed, the incremental punishment is quite modest, often amounting to only one sentencing level. *See* U.S.S.G. § 3D1.4.

Once again, it must be emphasized that this is a crude rather than precise calculus, but it serves as a significant check on the subjective preferences of sentencing judges. It is sufficient to indicate that had defendant been prosecuted more expeditiously in federal court, this Court's approach—guided by the letter and spirit of the sentencing guidelines—would have been to impose a sentence for the most part concurrent, but providing a modest additional punishment, roughly equivalent to one federal sentencing level, to provide a component of punishment specifically attributable to the federal offense.

## V. *Calculating the Sentence*

Defendant has been in state custody continuously since May 2001. According to the Pre–Sentence Report, his maximum release date is May 2011, ten years thereafter. But only five years of the state sentence is non-parolable. In coordinating the present sentence with the state sentence, the Court will not venture to predict the vagaries of state parole, particularly in a case where state authorities might decide that early parole is appropriate for an offender who will be released not to the community, but to certain deportation. Under these circumstances, the Court believes that at whatever time defendant had been presented for sentence in this Court, the Court's goal would have been to make the federal sentence concurrent only to the extent necessary to impose a sentence approximately *one federal sentencing level* longer than defendant's five-year state sentence. On the sentencing table under the federal guidelines, an increase of one sentencing level, in the ranges approximating five years, increases the sentencing range by approximately six to eight months. *See* Part 5A, Sentencing Table (providing sentencing levels of 51–63, 57–71, and 63–78 months). Thus, to the extent legally permissible, the Court would have sought to impose the sentence mandated by the guidelines in such a way as to result in a sentence ending in December 2006, approximately seven months after he becomes eligible for parole on his state sentence.

To achieve such a result today would require a sentence of 35 months, a departure of 11 months from the sentence prescribed by the guidelines. Based on the above discussion of the delay in processing defendant's federal case, an 11–month departure is clearly permissible. At a minimum, virtually all of the ten-month delay following reactivation of the case in May 2002 was unreasonable and unnecessary, and caused solely by the Government's inability to recall that defendant was already under indictment. As noted above, moreover, the Government was hardly fleet on its feet in proceeding before September 11, 2001, and its neglect of this case following the tragedy of that day, while certainly not wrongful in any way, equally certainly provides no just rationale for imposing additional imprisonment on this defendant.

Calculating the extent of a departure is not a precision exercise. Once it is determined that a case is outside the heartland contemplated by the guidelines, as this one certainly is, the test of the extent of the departure is "reasonableness." *United States v. Khalil*, 214 F.3d 111, 124 (2d Cir.2000). The Court's effort in this case has been to determine a reasonable sentence within the confines of the guideline system, recognizing the difficulties of coordinating state and federal sentences, the lack of congruity between parolable and non-parolable sentences, and the uncertainties inherent in reconstructing what might have occurred had parties behaved differently in the past. Under the guideline regime, that effort sometimes develops an illusion of mathematical rigor, at

**136**

the expense of common sense, but for the most part that is only an illusion. Properly construed, the guidelines represent not arbitrary numbers, to be manipulated according to rules of mathematics, but sensible judgments about the relative culpability and dangerousness of offenders, to be applied with a view to their purposes. If the exact numbers will in some cases be arbitrary, the approach and purposes of the guidelines are not.

In this instance, due to the unreasonable delay in prosecution, a departure is necessary in order to be faithful to the purposes of the guidelines themselves. The extent of the departure, and the resulting sentence, inevitably involves some arbitrariness; it could have been a bit greater or lesser without doing violence to its rationale. But the sentence reflects the policies of the guidelines, and results directly from the Court's efforts to adhere to the sentencing approach that the guidelines themselves encourage.

### CONCLUSION

A departure of eleven months, and a sentence of 35 months, to run concurrently with the defendant's state sentence, is appropriate in this case, and defendant has been sentenced accordingly.

SO ORDERED.