# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3422

_____

UNITED STATES OF AMERICA,     *
         *
       Appellee,     *
         *   Appeal from the United States
   v.          *   District Court for the
         *   District of Minnesota
TONNIE FRANKLIN WILLIAMS,     *
         *
       Appellant.     *

_____

Submitted:  March 11, 1999
Filed: June 22, 1999

_____

Before FAGG and WOLLMAN, Circuit Judges, and **WEBBER,**[1] District Judge.

_____

WEBBER, District Judge

Tonnie Williams appeals his convictions following a jury trial in the United States District Court[2] for the District of Minnesota.  The jury convicted Williams for (1) possession with intent to distribute crack cocaine in violation of 21 U.S.C. §

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

841(a)(1) and (2) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Williams raises several arguments in contesting his convictions. First, he contends that the evidence was insufficient to establish his intention to distribute the controlled substances. Second, he argues that the Government introduced inadmissible hearsay evidence that was prejudicial to his defense. Third, he argues that the Government introduced his own prejudicial statements into evidence notwithstanding the fact that such statements were coerced. We affirm Williams' convictions.

## I.

In February of 1998, a confidential informant provided information to Dakota County Deputy Sheriff Daniel Scheuermann regarding an individual known as Tonnie Williams, which led Deputy Scheuermann to believe that narcotics trafficking was occurring in Williams' apartment[3] in Burnsville, Minnesota. Prior to applying for a search warrant, Deputy Scheuermann consulted the Minnesota Bureau of Criminal Apprehension to obtain Williams' criminal history. From his research there, Deputy Scheuermann discovered that Williams was "at one time, charged with being a fugitive from justice relating to an incident in which he was charged with unauthorized use of a weapon."

Based on this research, his belief that drug dealers were known to possess firearms, and his discussion with the confidential informant, Scheuermann obtained a search warrant from the Dakota County district court on February 20, 1998. The warrant authorized a no-knock, unannounced entry of Williams' apartment at night. The warrant also authorized a search of "all garages and storage lockers assigned that apartment, the person of Tonnie Franklin Williams, and his vehicles."

---

[3]The lease agreement between Williams and the owner of the apartment, which was introduced at trial, shows that Williams was the only occupant of the apartment.

On February 27, 1998, Scheuermann and several other officers executed the search warrant at Williams' apartment. They gained entry to the apartment with the assistance of a flash-bang device, which was used to distract anyone who might have been in the apartment.[4] After the apartment was secure, approximately six officers, including Scheuermann, entered Williams' apartment and found Williams lying on the bed, where he was immediately handcuffed from behind.

Variations in Scheuermann's testimony provide differing accounts of the activities in Williams' apartment after he was handcuffed. At the motions hearing before Magistrate Judge Arthur J. Boylan, Scheuermann testified that he explained the purpose of his intrusion to Williams, told him he was under arrest, but gave Williams no Miranda warning. According to Scheuermann, Williams then stated, without being asked a question, that the officers would find a gun in the closet. At trial, however, Scheuermann testified on direct examination that he entered Williams' bedroom, placed him in an upright position, told him the officers' purpose for entering the apartment, and then asked him, with no Miranda warning, "[i]s there anything we need to be aware of?" Scheuermann testified that Williams responded to this questioning by stating that a gun was in the closet. After hearing Williams' statement, the officers located a loaded semi-automatic pistol on a shelf beneath some items in the closet of Williams' bedroom along with a small gram scale and a carton containing additional rounds of ammunition.

Regarding the events taking place in the bedroom the night the officers executed the warrant, officer Dennis King testified that he discovered a safe under the bed, and he asked Williams about its contents. Williams responded by stating that money and receipts were in the safe. When the officers asked Williams where the keys to the safe were located, he told the officers that the keys to the safe and the keys to the storage

---

[4]A flash-bang device distracts inhabitants of structures by creating loud noise and smoke.

locker were hanging on the wall. The examination of the safe revealed $19,456 in cash, personal identification of "Tony Williams," and other items.

The officers' search of the master bedroom uncovered a men's purse containing a wallet with $1,600.00 cash, documents bearing Williams' name, and a film cannister containing .49 grams of cocaine powder. The officers also discovered evidence of personal drug use in the form of rolling papers, a plastic baggie containing marijuana, a metal tray, and scissors, as well as some "burnt roaches."

Following the exchange between officers and Williams in the bedroom, Scheuermann escorted Williams to the living room of the apartment and moved Williams' handcuffs in front of him. Again, however, Scheuermann's testimony at trial and his testimony at the motions hearing provide differing accounts of the events transpiring during and after the moving of Williams from the bedroom to the living room. At the motions hearing, Scheuermann testified that while he was moving Williams into the living room, Williams expressed concern about the state of his apartment. He testified that Williams volunteered, in the absence of a Miranda warning, that he would show the officers where the "stuff" was located if they would stop disrupting the apartment. At the motions hearing, Scheuermann testified that he attempted to clarify Williams' statement further by asking "what stuff he was talking about." In response, Williams mentioned cocaine and marijuana. At trial, however, Scheuermann testified on direct examination that Williams offered to show him the "stuff" in response to Scheuermann's question about whether the officers "were going to find anything."

After this exchange between Williams and Scheuermann, Scheuermann read Williams a Miranda warning, which he tape-recorded along with statements made by Williams. As the tape reveals, Scheuermann asked Williams the following question following the Miranda warning: "Having these rights in mind, do you wish to talk to me now?." Williams responded as follows: "I don't know. I mean, I know what's

-4-

goin' on, but what, I mean, what, what happened?" When Scheuermann then stated that he just wished to talk about "those things" located in the apartment, Williams said "[o]kay." Williams then acknowledged, in response to Scheuermann's recitation of previous conversations between the two, that he told the officers they would find something in the kitchen of the apartment. Williams also stated that about two ounces of powder cocaine and about a half ounce of crack cocaine were in the oven in the apartment. Williams' statements regarding these amounts were accurate.

After Scheuermann taped Williams' statements, officers subjected the apartment and a storage locker[5] to thorough searches. The search of the apartment revealed the following items: (1) a clear plastic bag containing 19.96 grams of cocaine base; (2) a plastic bag containing 62.87 grams of cocaine powder; and (3) a purple Royal Crown bag containing baggies, scissors, cutting blades, and a Tanita digital scale. The search of the storage locker revealed the following items: (1) hundreds of plastic sandwich baggies with the corners missing and containing residual amounts of controlled substances; (2) another digital scale; (3) two bottles of inositol powder, which is a cutting agent for cocaine; (4) disposable rubber gloves; (5) two kilogram-sized wrappers containing cocaine powder residue; and (6) several different sized coolers containing 331 grams of cocaine powder and 111 grams of cocaine base.[6] The officers did not dust any of the evidence for fingerprints.

Prior to trial, Williams filed a "Motion to Disclose and Make Informant Available for Interview." In response, the prosecutor indicated that he did not intend to introduce any evidence regarding the information received from the informant at trial. Magistrate Judge Boylan denied Williams' motion.

---

[5]The rental agreement for the storage locker, which was introduced at trial, showed that Williams was the only individual renting the storage locker.

[6]In total, Williams' apartment and the storage locker contained 131 grams of cocaine base and 394 grams of cocaine powder.

In proving that Williams intended to distribute the controlled substances at trial, the Government did not present witnesses to testify that they had completed drug transactions with Williams or that they had witnessed Williams engaging in drug activity. The Government also did not put forth evidence indicating that Williams had engaged in drug trafficking in the past. The Government's first witness, Detective Scheuermann, testified in response to questioning by the Government that an informant stated that Williams was dealing narcotics from his apartment. In addition to Scheuermann's testimony, Special Agent John Boulger of the Minnesota Bureau of Criminal Apprehension testified on behalf of the Government that 131 grams of crack cocaine and 394 grams of powder cocaine are amounts that a person would have on hand for distribution, not for personal consumption. He also stated that his opinion that the drugs were for distribution purposes was based upon the quantity of drugs found as well as other items found by the officers during the search of the apartment and storage locker, including the scales, the large number of plastic bags with missing corners,[7] the inositol powder, the gun, the drug notes, the large amount of cash, and the two kilogram-sized wrappers. He also noted the absence of evidence indicating personal use of cocaine powder and cocaine base in the apartment.

On cross examination, Agent Boulger acknowledged that drug dealers had, in increasing numbers, started "taking over" the apartments of vulnerable individuals such as the elderly in order to conduct their illegal transactions from a "safe" house. Williams is a frail and elderly looking gentleman who has hepatitis, is a diabetic, and walks with a cane due to numerous knee surgeries. During closing arguments, defense counsel relied upon the cross examination of Agent Boulger and Williams' frail condition to argue to the jury that the Government failed to demonstrate that Williams

_____

[7]Boulger testified that drug dealers often packaged cocaine for buyers by placing it in the corner of a plastic baggie and then cutting off and knotting the corner of the baggie.

intended to distribute the drugs found in his apartment. The jury convicted Williams on both counts charged against him in the indictment.

## II.

Williams first argues that the evidence against him was not sufficient to establish that he intended to distribute controlled substances, because the Government relied solely upon the evidence seized from his apartment as well as the testimony of Agent Boulger, but did not present any other evidence of his intent to distribute the controlled substances. Williams emphasizes that no witnesses for the Government testified that he conducted a drug transaction with them or that they viewed any such drug transaction involving him. Thus, Williams argues that the Government failed to present evidence beyond his mere possession of the drugs to support its view that he possessed the drugs with the intent to distribute them. In addition, Williams argues that because Boulger's testimony indicates that some drug dealers "take over" the home of a vulnerable person, his testimony raises a reasonable doubt as to whether Williams, as opposed to another individual, intended to distribute controlled substances.

The standard of review of a claim based upon insufficient evidence is a strict one, and a verdict reached by a jury should not be overturned lightly. **United States v. Gillings**, 156 F.3d 857, 860 (8th Cir. 1998)(quoting **United States v. Burks**, 934 F.2d 148, 151 (8th Cir. 1991)). We may reverse convictions based upon insufficiency of the evidence "'only upon a demonstration that a rational jury would have had no choice but reasonably to doubt the existence of an element of a charged crime.'" **United States v. Jagim**, 978 F.2d 1032, 1041 (8th Cir. 1992)(quoting **United States v. Watson**, 952 F.2d 982, 987 (8th Cir. 1991)). In reviewing the evidence, we consider it "'in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict.'" **United States v. Madkins**, 994 F.2d 540, 541 (8th Cir. 1993)(quoting **United States v. Plenty Arrows**, 946 F.2d 62, 64 (8th Cir. 1991)). We will then uphold the convictions only if substantial evidence supports them. **Id.** We

will reverse only if we conclude "that a reasonable factfinder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." **United States v. Wint**, 974 F.2d 961, 968 (8th Cir. 1992)(citation omitted).

In this case, it was the Government's burden to demonstrate that Williams knowingly possessed controlled substances with the intention to distribute them. **Gillings**, 156 F.3d at 860. Williams argues that the Government failed to demonstrate that he had an intention to distribute the controlled substances in his possession. We disagree. Williams possessed 131 grams of crack cocaine and 394 grams of powder cocaine. Possession of such a large quantity of controlled substances is evidence indicating that a defendant intended to distribute the substances. **United States v. Billingsley**, 160 F.3d 502, 506 (8th Cir. 1998)(quoting **United States v. Buchanan**, 985 F.2d 1372, 1377 (8th Cir. 1993)). In addition, from the search of the apartment and the storage locker, officers found drug notes, used baggies containing residue of controlled substances with missing corners, inositol powder, at least $21,000.00 in cash, scissors, a blade, digital scales, and a loaded handgun.[8] Also, Boulger opined, based upon this evidence as well as the lack of evidence indicating personal use of the controlled substances, that the evidence was indicative of an intent to distribute the controlled substances.

We find that this evidence presented by the Government was sufficient to support Williams' convictions for possession of controlled substances with the intent to distribute them. **See Billingsley**, 160 F.3d at 506 (evidence of large quantity of drugs and items such as a cutting agent, scales, and wrapping supplies, which are "tools of the trade" for drug dealers, sufficient to establish that defendant intended to sell controlled substances); **Gillings,** 156 F.3d at 861 (noting that jury could infer intent to distribute controlled substances based upon quantity of drugs, cash, and drug

---

[8]A gun is considered a "tool of the trade" for individuals dealing in drugs, **United States v. Schubel**, 912 F.2d 952, 956 (8th Cir. 1990).

paraphernalia); **United States v. Smith**, 91 F.3d 1199, 1201 (8th Cir. 1996)(expert testimony that 9.9 grams of cocaine base exceeds amount attributable to personal use sufficient to support finding that defendant intended to distribute controlled substance); **United States v. Hughes**, 15 F.3d 798, 802-03 (8th Cir. 1994)(finding sufficient evidence of intent to distribute controlled substances in 25.5 grams of crack, a pager, $2,390 in cash, a police radio scanner, a loaded gun, and expert testimony that such evidence was indicative of an intent to distribute).[9]

Understanding the weight of the evidence against him, Williams argues that his case should not have been submitted to the jury, because the Government's expert agreed that in recent cases, drug dealers sometimes "take over" the home or apartment of vulnerable individuals for the purpose of selling drugs out of the home or apartment. In addition, Williams argues that because the Government failed to link him to the

---

[9]Williams relies on **United States v. Tomberlin**, 130 F.3d 1318 (8th Cir. 1997), **United States v. Thomas**, 58 F.3d 1318 (8th Cir. 1995), and **United States v. Dobynes**, 905 F.2d 1192 (8th Cir. 1990) in arguing that the Government must introduce other evidence beyond a defendant's mere presence at the scene where another individual intends to distribute controlled substances. We do not believe that Williams' reliance upon these cases is well founded. At most, these cases indicate that the Government is allowed under Federal Rule of Evidence 404(b) to present evidence of a defendant's other "bad acts" in order to rebut a "mere presence" defense. In the cases cited by Williams, the defendants asserted such a defense by claiming that they were unaware that they were in possession of controlled substances. In this case, it does not appear that Williams has made a "mere presence" defense, because he does not contest the fact that he possessed the drugs at issue in this case.

Moreover, even if Williams' argument is that his "mere presence" in the apartment is insufficient to establish that he also intended to distribute controlled substances, we conclude that the Government has presented substantial evidence supporting Williams' convictions. Because of this substantial evidence, we do not conclude that a reasonable juror must have entertained a reasonable doubt in regards to the Government's proof that Williams intended to distribute the controlled substances.

evidence in the apartment and the storage locker through fingerprinting or otherwise, the evidence creates a reasonable doubt as to whether Williams, as opposed to some other unnamed individual, intended to distribute the controlled substances. We disagree. The Government put forth substantial evidence regarding the quantity of drugs as well as equipment indicative of an intent to sell drugs. The apartment and the storage locker were in Williams' name. Under these facts, we do not conclude that a reasonable juror must have entertained a reasonable doubt that Williams possessed the controlled substances with an intent to distribute them. The jury had an opportunity to review Williams' theory after hearing all of the evidence in this case and after the closing arguments. The jury was in a position to weigh Williams' theory against the Government's evidence. The jury obviously rejected his theory. Under the facts of this case, we see no reason to overturn the jury's decision.

## III.

Williams next argues that the Government introduced inadmissible hearsay evidence that was prejudicial to his defense. Williams bases this claim upon Scheuermann's testimony, in response to a question made by the Government, that he received a tip from an informant regarding Williams' drug dealing from his apartment. Defendant's counsel objected to this evidence on the ground that this hearsay evidence deprived Williams of his Constitutional rights under the Confrontation Clause of the Sixth Amendment. Williams argues that such testimony was elicited notwithstanding the Government's indication, when it successfully opposed Williams' "Motion to Disclose and Make Information Available for Interview," that it would not introduce evidence regarding the information received from the informant or the controlled buy made by the first informant. Williams argues that this statement was the only evidence of distribution submitted by the Government, and was therefore prejudicial and reversible.

We conclude that even if the district court erred in admitting Scheuermann's testimony regarding the information he received from the informant,[10] such error was harmless. Evidentiary rule violations affecting a defendant's rights under the United States Constitution are analyzed under the standard set forth in **Chapman v. California**, 386 U.S. 18 (1967). **United States v. Wilcox**, 50 F.3d 600, 603 (8th Cir. 1995).[11] Williams claims that the admission of the informant's hearsay testimony violates his Sixth Amendment confrontation right. If this alleged error was "harmless beyond a reasonable doubt," Williams' convictions should be affirmed irrespective of whether the district court committed error in admitting the testimony. **Copley**, 938 F.2d at 110

When the evidence of a defendant's guilt is overwhelming, appellate courts have held that violations of the confrontation clause by the admission of hearsay statements are harmless beyond a reasonable doubt. **Id.** Williams argues that the district court's error was not harmless, because the Government's only evidence of his intent to

---

[10]The Government has acknowledged that the district court may have erred under **United States v. Blake**, 107 F.3d 651, 653 (8th Cir. 1997)(holding that when the only relevance of an informant's out-of-court statement is "to show the defendant committed the act he has been charged with, the statement is not properly admissible for a non-hearsay purpose")(citing **United States v. Azure**, 845 F.2d 1503, 1507 (8th Cir. 1988)).

[11]The Government argues that the district court's errors were harmless under the less stringent harmless error standard found in Federal Rule of Criminal Procedure 52(a). Under our interpretation of that Rule, "[a]n error is harmless if the reviewing court, after viewing the entire record, determines that no substantial rights of the defendant were affected, and that the error did not influence or had only a slight influence on the verdict." **United States v. DeAngelo**, 13 F.3d 1228, 1233 (8th Cir. 1994). However, because Williams alleges that the district court violated his Constitutional rights, we must apply the stricter standard set forth under **Chapman** as opposed to the less stringent standard under Federal Rule of Criminal Procedure 52(a). **United States v. Copley**, 938 F.2d 107, 110 (8th Cir. 1991)(citations omitted).

distribute controlled substances was the testimony of Agent Boulger, and his testimony indicated that the evidence was as likely to support an inference that an individual "took over" Williams' apartment for the purpose of drug dealing as it was that Williams actually distributed the drugs. Therefore, Williams argues that the hearsay statement of the informant was one of the strands[12] of inadmissible evidence that "tipped the scales" in the Government's favor.

We disagree with Williams' arguments. The Government presented overwhelming evidence of Williams' guilt. First, Williams admits that he possessed the substantial amounts of controlled substances at issue in this case. Second, officers found drug notes, used baggies, inositol powder, at least $21,000.00 in cash, scissors, a blade, digital scales, and a loaded handgun in Williams' apartment and the storage locker which was in his name. Third, the Government's expert testified that the Government's evidence combined with the lack of evidence of personal use of the controlled substances indicated that Williams possessed the controlled substances with an intent to distribute them. Given this overwhelming evidence of Williams' guilt and the relatively minor role of the alleged inadmissable hearsay statement, we conclude that any error resulting from admission of Scheuermann's recitation of the informant's statement was harmless beyond a reasonable doubt.

---

[12]Williams does not argue that the admission of the hearsay statement alone was sufficient to "tip the scales" in the Government's favor. Instead, he argues that the evidence "tipping the scales" in favor of the Government was the inadmissible hearsay statement and his own inadmissible statements. We address Williams' contentions in regards to his own allegedly inadmissible statements **infra.** in Section IV. We find that even if all the evidence challenged by Williams was improperly admitted, the admission of such evidence was harmless beyond a reasonable doubt under the facts of this case.

**IV.**

Williams' final argument is that the Government was improperly permitted to introduce his coerced statements into evidence. Williams bases this argument on the conflicting testimony of Deputy Scheuermann at trial and at the motions hearing before the Magistrate Judge. Williams argues that at trial, Scheuermann testified that statements made by Williams were not volunteered, but were actually made in response to Scheuermann's questions. When Williams moved to strike Scheuermann's testimony on this ground, the district court denied the motion. Williams claims the introduction of the coerced statements violated his Fifth Amendment right against self-incrimination.

Williams first contends that the admission of his statement that there was a gun in the closet in response to Scheuermann's inquiry "is there anything we need to be aware of?" was a violation of his Constitutional rights and was prejudicial to his defense. In response, the Government argues that Williams' statement was admissible under the public-safety exception to the Miranda rule. The Government also argues that even the statement was improperly admitted, such an admission was harmless. We will address each of these arguments, in turn.

First, we find that Williams' statement was admissible under the public safety exception to Miranda set forth by the Supreme Court in **New York v. Quarles**, 467 U.S. 649 (1984). Under that exception, a suspect's answers to questions from a police officer are admissible in the absence of a Miranda warning so long as the questions asked of the suspect are "'reasonably prompted by a concern for the public safety.'" **United States v. Lawrence**, 952 F.2d 1034, 1036 (8th Cir. 1992)(quoting **Quarles**, 467 U.S. at 656). The Court believes public safety concerns were an issue in this

case.[13] Although Williams' hands were cuffed behind his back when the officers asked him if they needed to be aware of anything else, the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons[14] were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way. Therefore, the district court did not commit error by admitting Williams' statement identifying the location of the gun.

In addition, we believe that even if the trial court erred in admitting this statement, such an error was harmless beyond a reasonable doubt. As we noted **supra.** in Section III., the Government presented overwhelming evidence of Williams' guilt in this case. In addition, the Government officers had secured a warrant to search

---

[13]While the officer did not specifically refer to weapons or safety concerns in the question posed to Williams, the question sought information related to weapons or other safety concerns. The fact that the question was also broad enough to elicit other information does not prevent application of the public safety exception when safety was at issue. Moreover, we believe that conditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to the **Quarles** Court's decision that an officer may forego announcement of Miranda warnings when public safety is threatened. The **Quarles** Court believed that the value of the Miranda warning was outweighed by safety concerns in situations "where spontaneity rather than adherence to a police manual is necessarily the order of the day." **Quarles**, 467 U.S. at 656. Under the circumstances of this case, the concerns for the safety of the officers required a spontaneous inquiry by the officer.

[14]As Williams notes, the officers also had information indicating that Williams had been arrested in the past on a weapons possession charge. Moreover, the officers had information indicating that Williams was dealing drugs out of his apartment. A gun is considered a "tool of the trade" for individuals dealing in drugs. **Schubel**, 912 F.2d at 956. Therefore, contrary to Williams' assertions, the officers did have information suggesting that Williams may have possessed a gun, other firearm, or explosive device.

Williams' entire apartment. Thus, the officers would have located the gun in the apartment even if Williams did not inform them of its location. Therefore, the gun would have been admissible even without Williams' statements under the inevitable discovery doctrine. **See** **United States v. Conner**, 127 F.3d 663, 667 (8th Cir. 1997)(noting that evidence is admissible if government demonstrates by preponderance of the evidence that (1) there was a reasonable probability that the evidence would have been discovered by lawful means and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation); **United States v. McConnell**, 903 F.2d 566, 570 (8th Cir. 1990)(inevitable discovery doctrine applies to evidence seized from a briefcase when police had a search warrant entitling them to search all of the baggage in defendant's room). Williams owned the apartment and appeared to be the only person who lived in it. From this evidence, the jury could have drawn the same inference that Williams owned the gun and was aware of its location as they could have from his statement indicating the location of the gun.

Williams also argues that the district court erred in admitting the statements he made to officer Scheuermann after officers moved him from the bedroom into the living room of the apartment. Given the overwhelming evidence of Williams' guilt in this case, we do not believe that the admission of his statements informing Scheuermann of the approximate amounts and location of powder and crack cocaine in the apartment played a major role in the jury's determination that Williams possessed the controlled substances with an intent to distribute them. The officers would have located the controlled substances even without Williams' statements. Therefore, such substances would have been admissible even in the absence of Williams' statements. **Conner**, 127 F.3d at 667; **McConnell**, 903 F.2d at 570. Williams owned the apartment and appeared to be the only individual living in it. The evidence in its entirety was sufficient to convict defendant without his statements. For these reasons, we find that any error attributable to the admission of Williams' statements was harmless beyond a reasonable doubt.

V.

For the reasons stated above, we affirm Williams' convictions.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.