******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., concurring. I agree with the majority that the public safety exception to the dictates of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), applied to the present case because the police officers had a legitimate concern about whether the defendant, Dante Smith, was armed, and whether the weapons identified by the victim, Justin Molinaro, could have been disposed of in a place where a child or other civilian might find them.[1] Here, however, well after the victim provided the police with an account of the attack and was transported for medical treatment, the defendant returned to the scene to speak with the police and was handcuffed before questioning commenced. One of the questions thereafter posed to the defendant was, "What happened?" I cannot agree that this question fell within the scope of the narrow public safety exception. Neither the majority's opinion nor my own research reveals a case in which any other court has concluded that such an open-ended question was properly "circumscribed by the exigency which justifies it"; *New York* v. *Quarles*, 467 U.S. 649, 658, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984); under circumstances akin to the present case. The majority's approval of such a question under the facts of this case is an unprecedented, and unwarranted, expansion of this limited exception to *Miranda*. I would conclude that the trial court improperly failed to suppress the defendant's inculpatory narrative that this impermissibly broad question predictably elicited. Because, however, the admission of the defendant's statements at the scene was harmless error, I concur in the judgment.

It is well settled that pre-*Miranda* questions "may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect." (Internal quotation marks omitted.) *United States* v. *Estrada*, 430 F.3d 606, 612 (2d Cir. 2005). Statements "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

As the majority purportedly recognizes, public safety gives rise to a *narrow* exception to the requirement that *Miranda* warnings be given before a custodial interrogation takes place. *New York* v. *Quarles*, supra, 467 U.S. 658; see also *Oregon* v. *Elstad*, 470 U.S. 298, 317, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (reaffirming narrow scope of exception). The rationale articulated by the United States Supreme Court for this exception is that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need

for the prophylactic rule protecting the [f]ifth [a]mendment's privilege against self-incrimination." *New York* v. *Quarles*, supra, 657. Significantly, the court in *Quarles* explained that the "exception will not be difficult for police officers to apply because in each case *it will be circumscribed by the exigency which justifies it.* . . . [P]olice officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." (Emphasis added.) Id., 658–59; see, e.g., id., 659 ("The facts of this case clearly demonstrate that distinction and an officer's ability to recognize it. [The officer] asked only the question necessary to locate the missing gun before advising [the] respondent of his rights.").

In determining whether a particular question is justified under the public safety exception, some courts have focused on the narrow scope of the exception, as well as the application of the exception in *Quarles*, and have determined that the question itself must be narrowly tailored to the actual safety concern. See, e.g., *United States* v. *Mengis*, Docket No. 04-CR-508-BR, 2006 WL 2552993, *3 (D. Or. August 31, 2006); *People* v. *Cressy*, 47 Cal. App. 4th 981, 989, 55 Cal. Rptr. 2d 237 (1996), review denied, 1996 Cal. LEXIS 6214 (Cal. October 30, 1996); *State* v. *Johnson*, 46 Kan. App. 2d 387, 395, 264 P.3d 1018 (2011), review denied, 293 Kan. 1111 (2012); *State* v. *Strozier*, 172 Ohio App. 3d 780, 791, 876 N.E.2d 1304 (2007), review denied, 116 Ohio St. 3d 1506, 880 N.E.2d 482 (2008); *State* v. *Spotted Elk*, 109 Wn. App. 253, 260, 34 P.3d 906 (2001). For example, one court concluded that an officer's question to an arrestee, "Do you have anything on your person I need to be concerned about?"; (internal quotation marks omitted) *State* v. *Spotted Elk*, supra, 256; was impermissible because it could elicit information pertaining not only to items that could injure the officer conducting the search (weapons, drug needles, etc.) but also to contraband, like drugs. Id., 260.

I agree with the majority's decision not to adopt this narrowly tailored approach. In my view, such an approach would impose an unrealistic burden on officers and ignore the exigent and unfolding nature of the circumstances justifying the public safety exception. Instead, I agree with the United States Court of Appeals for the Second Circuit and other courts that have concluded that questions "need not be posed as narrowly as possible, because [p]recision crafting cannot be expected in the circumstances of a tense and dangerous arrest. . . . Thus, a question that *plainly encompasses safety concerns*, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue *and context makes clear that the question primarily involves safety.*" (Citation omitted; emphasis added.) *United States* v. *Estrada*, supra, 430 F.3d 612; see also

*United States* v. *Newton*, 369 F.3d 659, 678 (2d Cir.) (recognizing that "public safety questions are framed spontaneously in dangerous situations" and that "[p]recision crafting cannot be expected in such situations"), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004). The limiting principles under this standard ensure that public safety is not a guise for an end run around *Miranda* while adequately accommodating the realities of the circumstances in which such concerns are present.

Although the majority purports to rely on the standard set forth by the Second Circuit, a review of public safety cases from that circuit and others demonstrates that the majority has not faithfully applied it. In those cases, courts carefully considered the focus of each question to determine whether it was framed in a manner that was more likely to elicit incriminating information rather than information related to the public safety concern at issue. See, e.g., *United States* v. *Reyes*, 353 F.3d 148, 153 (2d Cir. 2003) (The court cited with approval the United States Court of Appeals for the Tenth Circuit, which "found that the officers' focused questions addressed a real and substantial risk to the safety of the officers and were not designed to acquire incriminating evidence [but] solely to protect the officers, as well as the arrestee, from physical injury. . . . [*T*]*he risk of incrimination is limited to* [*nonresponsive*] *answers* [*such as in this case, when the suspect provides more information than requested*] . . . ." [Citations omitted; emphasis altered; internal quotation marks omitted.]).

A few examples demonstrate the reasoning applied in those cases. In *United States* v. *Newton*, supra, 369 F.3d 663, 679, the defendant, a convicted felon on parole, was asked whether he had any " 'contraband' " in his house. In discussing *Newton* in a subsequent case, the court noted that it found this question permissible because, "while the officer's question about 'contraband' could include items not presenting immediate safety concerns, the question plainly encompassed weapons, and the defendant's response indicated that he understood it along those lines." *United States* v. *Estrada*, supra, 430 F.3d 612. In *United States* v. *Khalil*, 214 F.3d 111, 121 (2d Cir.), cert. denied sub nom. *Mezer* v. *United States*, 531 U.S. 937, 121 S. Ct. 326, 148 L. Ed. 2d 262 (2000), the defendant was asked, inter alia, whether he had intended to kill himself in detonating a bomb that he had built. The court concluded that this question fell within the scope of the exception because it "had the potential for shedding light on the bomb's stability." Id. In *United States* v. *Reyes*, supra, 353 F.3d 150–51, before the police handcuffed or conducted a patdown search of the defendant, they asked him whether he had " 'anything on him' " or " 'anything inside [his] pocket' " that could hurt the officers. Although the defendant responded that he had drugs

in his vehicle, the court concluded that "the arresting officer's questions were sufficiently limited in scope and were not posed to elicit incriminating evidence. See [*New York* v. *Quarles*, supra, 467 U.S. 658–59]. Police cannot be faulted for the unforeseeable results of their words or actions." *United States* v. *Reyes*, supra, 154. In *United States* v. *Simmons*, 661 F.3d 151, 153–54 (2d Cir. 2011), the officers, who had escorted a complainant into his apartment to retrieve his belongings after the complainant reported that his roommate, the defendant, had displayed a gun during an argument a few days earlier, asked the defendant, inter alia, whether he had had a dispute with the complainant. The court concluded that this question was permissible because it "had the potential to shed light on the volatility of the situation and the extent to which [the defendant] harbored potentially violent resentment toward [the complainant]," whose presence the officers sought to secure. Id., 156. In sum, in all of these cases, although the question was broader than necessary to elicit information solely related to the public safety concern, it "plainly encompasse[d]" that concern, and the "context [made] clear that the question *primarily* involve[d] safety." (Emphasis added.) *United States* v. *Estrada*, supra, 612.

Those questions stand in stark contrast to the open-ended question in the present case: "What happened?" Although such a question might be proper under limited circumstances, this was not such a case. To understand why, it is useful to examine cases in which courts have been confronted with a similarly broad, generalized question.

In *Bowling* v. *State*, 289 Ga. 881, 882, 717 S.E.2d 190 (2011), an officer providing back up at the scene of a shooting asked a suspect "[w]hat happened?" The Supreme Court of Georgia concluded that this "inquiry did not fall within the public safety exception. When [the officer] arrived, the other officers already understood the general nature of the situation, and as soon as [the officer] arrived, he heard [the defendant] yelling that he had shot [the victim] and that it was an accident. Under the circumstances, the existing exigency facing officers was locating the gun, and [the officer's] broader inquiry about what happened was not focused on this issue. Compare [*New York* v. *Quarles*, supra, 467 U.S. 659] (officer 'asked only the question necessary to locate the missing gun')." *Bowling* v. *State*, supra, 889; see also *People* v. *Olachea*, Docket No. E040239, 2007 WL 1874751, *6, 10 (Cal. App. June 29, 2007) (" '[w]hat do you got going on here?' " was not permissible question because it was "a broad question calling for an infinitely variable response"); *People* v. *Libran*, Docket No. 2006QN062774, 2007 WL 543451, *3 (N.Y. Misc. January 18, 2007) (officer's question of " 'what happened' " deemed impermissible) (decision without published opinion, 14 Misc. 3d 1234[A], 836 N.Y.S.2d 502 [2007]).

By contrast, courts have recognized that public safety demands may justify a more open-ended question when the nature of the threat is indeterminate, and the exigent circumstances are still unfolding while the officers are on the scene. In *United States* v. *Williams*, 181 F.3d 945, 953 (8th Cir. 1999), cited with approval by the Second Circuit; see *United States* v. *Reyes*, supra, 353 F.3d 152; the United States Court of Appeals for the Eighth Circuit sanctioned an inquiry to an arrested drug dealer in his apartment—"Is there anything we need to be aware of?"—that prompted the defendant to respond that he had a gun in the closet. (Internal quotation marks omitted.) *United States* v. *Williams*, supra, 953. The court in *Williams* explained that although the question "did not specifically refer to weapons or safety concerns," it plainly encompassed such matters. Id., 953 n.13. "The fact that the question was also broad enough to elicit other information [did] not prevent application of the public safety exception when safety was at issue." Id. "[T]he officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way." (Footnote omitted.) Id., 953–54; see also *United States* v. *McKee*,      F. Supp. 3d     , Docket No. 3:15-cr-007-RCJ-VPC, 2016 WL 320124, *6 (D. Nev. January 26, 2016) (officers' questions to defendant, whose wife was found stabbed short distance from their home, including " 'what happened?' " were permissible because at that point officers "did not know what had happened, whether a perpetrator might be lurking about the home, or whether weapons were in the area"); *State* v. *Vickers*, 159 Ariz. 532, 535, 539, 768 P.2d 1177 (1989) (officer permissibly asked defendant, who had lit fire, what happened and whether victim was dead in order to make strategic plan as to which persons needed to be rescued first who were endangered by fire); *State* v. *Santiago*, Docket No. 01CA007798, 2002 WL 388901, *1, 4 (Ohio App. March 13, 2002) (officers responding to 911 call who entered apartment and observed defendant lying facedown covered in blood permissibly asked what happened, because at that point in time "the officers did not know if there were other people involved, who could still be in the apartment lying in wait, and did not know the type and location of weapon used, if any"); *State* v. *Kuloglija*, Docket No. 65809-3-I, 2013 WL 616375, *4 (Wn. App. February 19, 2013) ("[C]oncern for victim safety and urgency to control a dangerous situation necessitated [the officer's] questions. When [the officer] came across [the defendant], [the defendant] was lying face down, covered in blood, and clearly injured. . . . [The officer] testified that at that point, he thought [the defendant] was another victim and he

'didn't know what was going on.' . . . When he asked [the defendant] what happened, there was an objectively reasonable need to secure the scene and locate other possible victims or a fleeing suspect." [Footnote omitted.]) (decision without published opinion, 173 Wn. App. 1017 [2003]).

In the present case, the circumstances are akin to *Bowling*, where the officers understood the nature of the public safety threat but nevertheless asked an impermissibly broad, open-ended question.[2] See also *People* v. *Libran*, supra, 2007 WL 543451, *2–3 ("Unlike a situation which is confusing or unfolding, [the officer] arrived at the store after the crime had been committed. [One of the store's security guards] expressly implicated the defendant. Although a police officer's question of 'what happened' is often permissible as investigatory to clarify the situation, in this case, [the officer] 'transcended the boundary between an attempt to clarify the situation and an attempt to elicit a statement.' "). The majority implicitly concedes that the question "what happened" would be impermissible in isolation because it relies on questions relating to weapons that preceded that inquiry to provide the necessary narrowing context. Even assuming that prior questions may provide the requisite context, the majority's approach is unpersuasive under the circumstances of the present case.

Simply put, the facts here tell a different story. The victim had given a statement and had been transported for medical treatment when the defendant returned approximately forty or fifty minutes after the assault, upon learning that the police were looking for him. The officers initially told the defendant that "he was going to be detained while [they] *investigated* [*the*] *incident*." (Emphasis added.) The defendant was then asked questions to ascertain whether he had a weapon on him and whether he knew where the weapons are. He responded in the negative to both questions. It was after this exchange that the officers asked what happened.

An objectively reasonable listener would not have concluded that the latter question was focused on, or even necessarily related to, the current location of the weapons. Questions relating to the weapons had been asked and answered. Those initial questions were stated using the present verb tense. The broad question "what happened" was phrased in the past tense. A reasonable listener would have assumed from the expanded scope and change of verb tense, as well as the fact that questions relating to weapons had been asked and answered, that the police were shifting the discussion to a different topic. Cf. *Davis* v. *Washington*, supra, 547 U.S. 828–29 ("This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot . . . evolve into testimonial statements . . . once that purpose has been achieved. . . .

This presents no great problem. Just as, for [f]ifth [a]mendment purposes, police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect, *New York* v. *Quarles*, [supra, 467 U.S. 658–59], trial courts will recognize the point at which, for [s]ixth [a]mendment purposes, statements in response to interrogations become testimonial." [Citations omitted; internal quotation marks omitted.]). Consistent with the initial stated purpose of his detention, the defendant reasonably would have assumed that the officer's question as to "what happened" was investigatory in nature, intended to elicit a narrative of the assault. The defendant's response indicates that this is precisely how he understood the question. Cf. *United States* v. *Newton*, supra, 369 F.3d 679 (citing defendant's response indicating that he understood question to encompass presence of weapons as indicative that question was focused on public safety); *United States* v. *Reyes*, supra, 353 F.3d 154 (deeming it significant that questions were not posed in manner that would naturally elicit incriminating evidence). Indeed, in response to his narrative, the officers challenged the defendant's account of the manner in which the victim had been injured. Cf. *United States* v. *Reyes*, supra, 154–55 ("It is not without significance that, after [the defendant] gave the incriminating response about having drugs in his car, the officer asked no further questions. The arresting officer's disinclination to exploit the situation suggests that his question was a reasonable attempt to insure his personal safety in the midst of a search." [Internal quotation marks omitted.]).

I also am not persuaded that the fact that the victim had informed the police that six people were involved in the assault justified the broad question that elicited the defendant's inculpatory narrative. I begin with the observation that, although an inference could be drawn from the victim's statement to the 911 operator that some or all of the defendant's accomplices may have been armed with guns,[3] the trial court's opinion indicates that it did not draw such an inference. Instead, it appears to have credited the evidence only insofar as it established the presence of a single gun, as the court repeatedly and exclusively referred to "a gun." "Missing accomplices cannot be equated with missing guns in the absence of evidence that the accomplice presents a danger to the public 'requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime.' " *State* v. *Hazley*, 428 N.W.2d 406, 411 (Minn. App. 1988), review denied, 1988 Minn. LEXIS 763 (Minn. September 28, 1988).

Nonetheless, even if we were to adopt that inference, it would be impermissible to ask the defendant what happened for two reasons similar to those previously

articulated. First, this question did not on its face or in context plainly relate to the current whereabouts of these accomplices.[4] There are numerous instances in which police officers have varyingly framed a question to properly accomplish that end. See, e.g., *United States* v. *Johnson*, Docket No. 03-40068-01-RDR, 2003 WL 22715856, *3 (D. Kan. September 9, 2003) (citing cases in which questions were deemed permissible when suspect was asked if he was alone, if anyone else was inside dark building, where his companion was, and where another suspect was located). In fact, it was only in response to a specific question about the other assailant identified by name by the victim that the defendant indicated that this other person had not been involved.

Second, in cases in which properly framed questions were deemed justified to elicit information as to the whereabouts or the number of accomplices, those accomplices presented an objective and immediate threat to the safety of the officers or members of the public. See, e.g., *Fleming* v. *Collins*, 954 F.2d 1109, 1113 (5th Cir. 1992) (permissible for officers responding to silent alarm in bank robbery to ask wounded defendant encountered near bank who had been with him because situation was still volatile and officer had reason to fear for officers' safety at time she asked question); *United States* v. *Johnson*, supra, 2003 WL 22715856, *3 (permissible for officer chasing suspects fleeing from bank robbery into apartment complex to ask captured suspect how many persons were involved and who they were because "events were unfolding rapidly" and officer was unsure what dangers he faced from other suspects); *Howard* v. *Garvin*, 844 F. Supp. 173, 175 (S.D.N.Y. 1994) (permissible to ask suspect how many people were with him at scene of robbery while hostages were being held because information was needed for immediate public safety and questions did not relate to what perpetrator had done, even though responses were indicative of guilt); *Hill* v. *State*, 89 Md. App. 428, 433–34, 598 A.2d 784 (1991) (after apprehending two of three robbery suspects who fled crime scene at residential complex, at least one of whom was in possession of gun, it was permissible for police officer to ask where third suspect was because situation was volatile, officers reasonably believed that third suspect could have retaliated by opening fire, and armed suspect posed danger to police team and to people who traversed in area where robbery and flight had occurred); *Commonwealth* v. *Clark*, 432 Mass. 1, 11, 13–14, 730 N.E.2d 872 (2000) (permissible for officer who arrived first at scene of shooting after report that state trooper and civilian had been shot to ask injured defendant whether he was alone because question served to discover whether there were other individuals nearby who might pose risk to public safety when shooting took place near residential neighborhood, civilians from neighborhood

had begun to gather near scene, and weapon had not yet been found); *People* v. *Adams*, 225 App. Div. 2d 506, 640 N.Y.S.2d 37 (upon finding defendant and two of potentially five accomplices in rear of warehouse that they had just robbed, during which numerous shots had been fired, officer's inquiry as to how many perpetrators there were and whether they had any guns was permissible because it was intended to clarify situation and not to elicit admissions), appeal denied, 88 N.Y.2d 932, 647 N.Y.S.2d 166 (1996); *People* v. *Ratliff*, 184 App. Div. 2d 667, 668, 584 N.Y.S.2d 871 (1992) ("With scores of people outside the club where a robbery took place and the defendant and one codefendant in custody, the question posed to the defendant as to the number and whereabouts of the remaining robbers was more for the purpose of clarifying the situation and ascertaining for safety reasons the location of possible weapons, than to secure evidence of a crime . . . . The record further demonstrates that the officer's questioning of the defendant about his codefendants was part of the continuous action of apprehending the defendant, handcuffing him, and escorting him to the police vehicle while the danger to the public from his armed confederates had not yet been eliminated . . . ." [Citations omitted; internal quotation marks omitted.]).

In the present case, there is no evidence that, at the time the officer questioned the defendant forty or fifty minutes after the assault had occurred, his accomplices posed a present or imminent risk of harm to the officers, the public generally, or any person specifically other than the victim, who was known to many or all of the perpetrators. In fact, the officers' conduct suggests the contrary. One officer, describing the situation at the time of the defendant's return, indicated that, "[b]y this time, the craziness of the scene had died down." The officers "were kind of milling around, doing a neighborhood canvass." Although neighborhood residents also were "milling around," there is no indication that the police advised them to return to their homes. The fact that the assailants had left the victim's car running with the door ajar indicated that the assailants had fled the scene. Indeed, at the suppression hearing, the officers repeatedly identified discarded weapons as the exigent threat and never indicated that they believed that they were in imminent danger.[5] My research has not revealed a single case in which the flight of a potentially armed suspect, in and of itself, was deemed to justify such an open-ended question. Indeed, the narrow public safety exception to *Miranda* would largely swallow the rule if this fact alone justified such a question.

Under these circumstances, it is manifestly unreasonable to conclude that "[the] context makes clear that the question primarily involve[d] safety"; *United States* v. *Estrada*, supra, 430 F.3d 612; and therefore was permissible under the public safety exception to *Miranda*. I have grave concerns that the majority's contextual

approach sanctions a pretextual approach—bootstrapping public safety questions to purely investigatory questions to make an end run around *Miranda*.[6] Cf. *United States* v. *Simmons*, supra, 661 F.3d 156 ("[w]e are not persuaded that this limited questioning was prohibitively 'investigatory in nature' or a subterfuge for collecting testimonial evidence"). Accordingly, the trial court improperly denied the defendant's motion to suppress his statement at the crime scene in response to the question "[w]hat happened?"

Nonetheless, I conclude that the admission of this statement was harmless beyond a reasonable doubt. The defendant's crime scene statement was largely redundant in light of his subsequent, more detailed statement at the police station that was admitted into evidence through the officer's testimony who took the statement. The defendant's sole claim with regard to harm is that a few inconsistencies between his statement at the scene and his police station statement or his trial testimony undermined his credibility. I am not persuaded.

The defendant admitted at the police station and at trial to having assaulted the victim. At trial, the defendant claimed to have acted in self-defense. The jury had before it a plethora of evidence other than the defendant's crime scene statement from which it could have concluded that the defendant's theory was not credible, including physical evidence that conflicted with the defendant's account of the altercation, the absence of a claim of self-defense in the defendant's statement at the police station, and various inconsistencies between his police station statement and his trial testimony.[7] Accordingly, the limited inconsistencies between the defendant's crime scene statement on the one hand and his police station statement and trial testimony on the other hand were minor in comparison to other evidence from which the jury could have concluded that the defendant was not credible.

Moreover, we have recognized that "statements obtained in violation of *Miranda*, if not the product of improper police coercion, are admissible for impeachment purposes." *State* v. *Mangual*, 311 Conn. 182, 192 n.10, 85 A.3d 627 (2014). The trial court found that the officers who interrogated the defendant at the scene "at no time engaged in any coercive police activity whatsoever . . . ." I am not persuaded that this finding was clearly erroneous. The state was therefore entitled to use the defendant's crime scene statement to impeach the defendant. The state did just that when it recalled the officers who interrogated the defendant at the crime scene and elicited some of the very inconsistencies that the defendant claims were harmful. Although a state's witness commented on one of these inconsistencies during the state's case-in-chief, the jury nevertheless properly heard that same evidence in the state's rebut-

tal. I am therefore compelled to conclude that the admission of the defendant's statement in response to the question "[w]hat happened?" was harmless beyond a reasonable doubt. I therefore respectfully concur in the judgment.

[1] In the present case, the circumstantial evidence indicating that the defendant or any accomplice actually discarded a weapon, let alone discarded one in a place accessible to the public, is not as strong as it could be. Cf. *New York* v. *Quarles*, 467 U.S. 649, 651–52, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984) (public safety threat when defendant seen fleeing into grocery store with gun and was later apprehended in store wearing empty gun holster and without gun in his possession). It is important, therefore, to identify the basis for an inference that he, or his accomplices, could have done so. Such an inference is supported in the present case under the totality of the following considerations: the victim's ability to name the defendant and some of his accomplices as his attackers; the possibility that the victim's attackers saw him on his cell phone as they returned to the scene and assumed that the police had been summoned; and an officer's trial testimony that perpetrators often discard or secrete their weapons after committing a crime.

[2] As I explain later, the officers' conduct at the scene makes clear that they were not under the impression that the victim's assailants were then present at the scene or likely to return to the scene. Indeed, in discussing the nature of the public safety concern, no officer cited such a possibility as one of his concerns.

[3] The majority states that "[t]he victim had also told the [911] dispatcher that six people were coming back to the scene with guns." Although this statement is correct, it is important to clarify that it related to the victim's observation while on the telephone with the dispatcher, namely, that the defendant and his accomplices were returning to the scene in the victim's stolen vehicle at that time. The defendant and his accomplices thereafter left the vehicle at the scene. There was no evidence that the defendant's accomplices intended to return to the scene of the crime after returning the vehicle. As I explain later, the conduct of the police would not support such an inference.

[4] I recognize that any statement or question "that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation" for purposes of *Miranda*; (internal quotation marks omitted) *State* v. *Ramos*, 317 Conn. 19, 29, 114 A.3d 1202 (2015); and thus the public safety exception is not inapplicable simply because a question is likely to elicit such a response.

[5] Only one officer mentioned any concern other than the location of the weapons at the suppression hearing. That officer stated: "We still had another suspect out there with a possibility he had a gun on him." This statement obviously refers to a single suspect, presumes that this suspect is still in possession of his weapon, and that the suspect has fled from the scene.

[6] I am not suggesting that the officers in the present case engaged in a subterfuge. Rather, I am pointing out that the majority's approach provides a road map for how to engage in one whenever a colorable public safety threat exists. The majority appears to miss the point that the officers' purpose can evolve from one that is permissible to another that is impermissible either by virtue of a change in circumstances (public safety concern has been ameliorated) or by a change in the nature of the questions posed. Moreover, although an overly broad question may be evidence of a subterfuge, application of the public safety exception ultimately does not depend on the officers' subjective intent. *New York* v. *Quarles*, supra, 467 U.S. 656. Therefore, the officers in the present case may have intended their question to elicit information related to public safety concerns—a permissible purpose—but nonetheless impermissibly framed the question in a manner that was not reasonably conducive to accomplishing that purpose.

[7] The defendant also claims that his police station statement was inadmissible pursuant to *Missouri* v. *Seibert*, 542 U.S. 600, 617, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), under which suppression of a subsequent, voluntary confession is required when police intentionally violated *Miranda* in obtaining an initial confession. I agree with the state that the record is inadequate to review this unpreserved claim. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The trial court did not make the requisite factual findings necessary to prevail on a *Seibert* claim, and there are not undisputed facts in the record from which we could make such a determina-

tion as a matter of law.

_____